ORAL ARGUMENT HAS NOT BEEN SCHEDULED

Nos. 11-1486, *et al.*

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

ELECTRIC POWER SUPPLY ASSOCIATION, ET AL.,

*Petitioners,*

v.

FEDERAL ENERGY REGULATORY COMMISSION, ET AL.,

*Respondents.*

————————

**OPENING BRIEF OF PETITIONERS
ELECTRIC POWER SUPPLY ASSOCIATION, AMERICAN PUBLIC
POWER ASSOCIATION, NATIONAL RURAL ELECTRIC
COOPERATIVE ASSOCIATION, OLD DOMINION ELECTRIC
COOPERATIVE AND EDISON ELECTRIC INSTITUTE**

————————

David G. Tewksbury
Stephanie S. Lim
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
Email: dtewksbury@kslaw.com
Email: slim@kslaw.com

Ashley C. Parrish
 *Counsel of Record*
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 626-2627
Facsimile: (202) 626-3737
Email: aparrish@kslaw.com

*Counsel for Petitioner Electric Power Supply Association*

DATED: June 6, 2012        *  Additional counsel listed on inside cover

Harvey L. Reiter
  *Counsel of Record*
Adrienne E. Clair
STINSON MORRISON HECKER LLP
1775 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 728-3016
Facsimile: (202) 785-9163
Email: hreiter@stinson.com
Email: aclair@stinson.com

*Counsel for Petitioners American Public Power Association, National Rural Electric Cooperative Association and Old Dominion Electric Cooperative*

David B. Raskin
  *Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 429-6254
Facsimile: (202) 429-3902
Email: draskin@steptoe.com

*Counsel for Petitioner Edison Electric Institute*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties, Intervenors, and Amici**

The following is a list of all parties, intervenors, and *amici curiae* who have appeared before this Court in this appeal:

American Forest & Paper Association, Inc.

American Municipal Power, Inc.

American Public Power Association

California Public Utilities Commission

California Independent System Operator Corporation

Coalition of Midwest Transmission Customers

Edison Electric Institute

EnergyConnect, Inc.

EnerNOC, Inc.

Federal Energy Regulatory Commission

Lower Mount Bethel Energy, LLC

Madison Gas and Electric Company

Maryland Public Service Commission

Missouri Joint Municipal Electric Utility Commission

Missouri River Energy Services

National Rural Electric Cooperative Association

Old Dominion Electric Cooperative

Pennsylvania Public Utility Commission

PJM Industrial Customer Coalition

PJM Interconnection, L.L.C.

PJM Power Providers Group

PPL Brunner Island, LLC

PPL Electric Utilities Corporation

PPL EnergyPlus, LLC

PPL Holtwood, LLC

PPL Maine, LLC

PPL Martins Creek, LLC

PPL Montour, LLC

PPL Susquehanna, LLC

PSEG Energy Resources & Trade LLC

PSEG Power LLC

Public Service Electric and Gas Company

Southern Minnesota Municipal Power Agency

Steel Producers

Viridity Energy Inc.

Wal-Mart Stores, Inc.

WPPI Energy

The following persons and entities appeared before the Federal Energy Regulatory Commission in the underlying administrative proceedings:

Alcan Primary Products Corporation

Alcoa Inc.

Alliance for Clean Energy New York, Inc.

Alliance to Save Energy

American Chemistry Council

American Clean Skies Foundation

American Council for an Energy-Efficient Economy

American Electric Power Service Corporation

American Forest & Paper Association

American Municipal Power, Inc.

American Public Power Association

American Wind Energy Association

ArcelorMittal USA Inc.

Battelle Pacific Northwest Laboratories

Robert J. Borlick

Boston College Law School Administrative Law Class

California Department of Water Resources State Water Project

California Independent System Operator Corporation

California Public Utilities Commission

Calpine Corporation

Capital Power Corporation

Dr. Charles J. Cicchetti

Cities of Anaheim, Azusa, Banning, Colton, Pasadena, and

Riverside, California

Citizens for Pennsylvania's Future

Coalition of Midwest Transmission Customers

Connecticut Municipal Electric Energy Cooperative

Consert Inc.

Conservation Law Foundation

Consolidated Edison Solutions, Inc.

Constellation Energy Commodities Group, Inc.

iv

Consumer Demand Response Initiative

Consumer Power Advocates

Consumers Energy Company

CPG Advisors, Inc.

CPower, Inc.

Crane & Co., Inc.

Delaware Public Service Commission

Demand Response and Smart Grid Coalition

Demand Response Supporters

Derstine's Inc.

Detroit Edison Company

Direct Energy Services, LLC

Dominion Resources Services, Inc.

Duke Energy Corporation

Durgin and Crowell Lumber Co., Inc.

Edison Electric Institute

Edison Mission Energy

Electric Power Generating Association

Electric Power Supply Association

Electricity Committee

Electricity Consumers Resource Council

Electrodynamics, Inc.

Energy Curtailment Specialists, Inc.

EnergyConnect, Inc.

Energy Future Coalition

EnerNOC, Inc.

Environmental Defense Fund

Exelon Corporation

Federal Trade Commission

FirstEnergy Service Company

GDF SUEZ Energy North America, Inc.

Hess Corporation

Dr. William W. Hogan

Illinois Citizens Utility Board

Illinois Commerce Commission

Independent Power Producers of New York, Inc.

Indicated New York Transmission Owners

Industrial Energy Consumer Group

Industrial Energy Consumers of America

Industrial Energy Consumers of Pennsylvania

Intergrys Energy Services, Inc.

International Power America, Inc.

Irving Forest Products, Inc.

ISO New England Inc.

ISO-NE Internal Market Monitor

Jiminy Peak Mountain Resort, LLC

Joint Consumer Advocates

Dr. Alfred E. Kahn

Limington Lumber

Lower Mount Bethel Energy, LLC

Madison Paper Industries

Maryland Governor Martin O'Malley

Maryland Public Service Commission

Massachusetts Attorney General

Midwest Independent Transmission System Operator, Inc.

Midwest ISO Transmission Owners

Midwest Transmission Dependent Utilities

Mirant Corporation

Monitoring Analytics, LLC

National Electrical Manufactures Association

National Energy Marketers Association

National Rural Electric Cooperative Association

National Grid USA

National League of Cities

Natural Gas Supply Association

New England Conference of Public Utilities Commissioners

New England Consumer Advocates

New England Power Generators Association Inc.

New England Power Pool Participants Committee

New England Public Systems

New Jersey Board of Public Utilities

New York Independent System Operator, Inc.

New York Mayor Michael R. Bloomberg

New York State Consumer Protection Board

New York State Public Service Commission

North America Power Partners LLC

Northeast Utilities Services Company

Northern California Power Agency

NSTAR Electric Company

Occidental Chemical Corporation

Occidental Permian Ltd.

Office of the People's Counsel for the District of Columbia

Okemo Mountain Resort

Old Dominion Electric Cooperative

Organization of MISO States

Partners HealthCare

Pennsylvania Department of Environmental Protection

Pennsylvania Office of Consumer Advocate

Pennsylvania Public Utility Commission

Pennsylvania State Representative Chris Ross

Pepco Holdings, Inc.

PJM Interconnection, L.L.C.

PJM Power Providers Group

Potomac Economics, Ltd.

PPL Brunner Island, LLC

ix

PPL Electric Utilities Corporation

PPL EnergyPlus, LLC

PPL Holtwood, LLC

PPL Maine, LLC, PPL Martins Creek, LLC

PPL Montour, LLC

PPL Susquehanna, LLC

Praxair, Inc.

Precision Lumber, Inc.

Price Responsive Load Coalition

PSEG Energy Resources & Trade LLC

PSEG Power LLC

Public Interest Organizations

Public Service Electric and Gas Company

Public Utilities Commission of Ohio

Raritan Valley Community College

RRI Energy, Inc.

San Diego Gas & Electric Company

Schneider Electric USA, Inc.

Dr. Roy J. Shanker

Southern California Edison Company

Southwest Power Pool, Inc.

Steel Manufacturers Association

Steel Producers

Tendrill Networks, Inc.

The Brattle Group

The E Cubed Company, L.L.C.

University of California, San Diego

Utility Economic Engineers

Verso Paper Corporation

Virginia Committee for Fair Utility Rates

Viridity Energy, Inc.

Wal-Mart Stores, Inc.

Waterville Valley Ski Resort Inc.

Westar Energy, Inc.

Wisconsin Industrial Energy Group

**Rulings Under Review**

The Commission orders under review are:

*Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745, Final Rule, FERC Stats. & Regs. ¶ 31,322 (Mar. 15, 2011); and

*Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745-A, Order on Rehearing and Clarification, 137 FERC ¶ 61,215 (Dec. 15, 2011).

**Related Cases**

This case is not pending in any other court, and is not related to any other case in this Court or in any other court.

## CORPORATE DISCLOSURE STATEMENT

In accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, petitioners make the following disclosures:

## ELECTRIC POWER SUPPLY ASSOCIATION

The Electric Power Supply Association ("EPSA") is a national trade association that represents the competitive power industry and is incorporated under the laws of the District of Columbia. There is no parent corporation or any publicly held corporation that owns 10 percent or more of EPSA's stock.

EPSA's members include 15 companies, along with numerous supporting members, and state and regional partners that represent the competitive power industry in their respective regions. EPSA's members have significant financial investments in electric generation and electricity marketing operations across the country.

EPSA's organizational purpose is, among other things, to promote a favorable market environment for the competitive electric industry; to support the development of state and federal legislative and regulatory

policies that encourage the development and implementation of competitive wholesale markets for electricity; and to improve the public's awareness of the competitive electric industry.

## AMERICAN PUBLIC POWER ASSOCIATION

The American Public Power Association ("APPA") is an association of governmental entities to which Rule 26.1 does not apply. APPA is the national service organization representing the interests of not-for-profit, publicly owned electric utilities throughout the United States. More than 2,000 public power systems provide over 15 percent of all kilowatt-hour sales to ultimate customers, and APPA members do business in every state except Hawaii. Many APPA members sponsor or participate in "demand response" programs in the course of providing retail electric utility services.

## NATIONAL RURAL ELECTRIC COOPERATIVE ASSOCIATION

The National Rural Electric Cooperative Association ("NRECA") is a not-for-profit national service organization with no parent entity or publicly-traded stock. It is the national service organization for more than 900 not-for-profit rural electric cooperatives and public power districts providing retail electric service to more than 42 million customers in 47 states.

NRECA's members include consumer-owned local distribution systems and 66 generation and transmission cooperatives that supply wholesale power to their distribution cooperative owner-members.

**OLD DOMINION ELECTRIC COOPERATIVE**

Old Dominion Electric Cooperative ("ODEC") is a not-for-profit power supply electric cooperative with no parent entity and no publicly-traded stock. It is a regional, consumer-owned power supplier that was formed in 1948 to provide power to a consortium of electric distribution cooperatives. In 2011, ODEC's 11 members served over 550,000 retail electric consumers, representing approximately 1.2 million member-owners along 59,000 miles of line. The service territories served by ODEC's members cover large portions of Virginia, Maryland, and Delaware.

**EDISON ELECTRIC INSTITUTE**

The Edison Electric Institute ("EEI") is the trade association of the U.S. shareholder-owned electric companies. EEI members serve 95 percent of the ultimate customers in the shareholder-owned segment of the industry, and they represent approximately 70 percent of the U.S. electric power industry. EEI's diverse membership includes utilities operating in all regions of the

U.S. EEI does not have any parent companies, and no publicly-held company has a 10 percent or greater ownership interest in EEI. EEI does not issue stock.

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... 1

STATUTORY AND REGULATORY PROVISIONS ............................. 1

STATEMENT OF ISSUES ..................................................................... 2

INTRODUCTION .................................................................................. 3

STATEMENT OF CASE AND FACTS ................................................. 6

    A.    The Federal Power Act ........................................................ 6

    B.    The Organized Wholesale Markets.................................... 9

    C.    The Relationship Between Wholesale And Retail Rates ............. 11

    D.    The Commission's Orders ................................................ 15

SUMMARY OF ARGUMENT .............................................................. 22

STANDING............................................................................................ 24

STANDARD OF REVIEW .................................................................... 25

ARGUMENT ......................................................................................... 27

I.    The Commission's Orders Exceed Its Statutory Authority.................... 27

    A.    The Federal Power Act Prohibits The Commission From Regulating Retail Services. ................................................ 27

    B.    The Commission's Authority Over Practices Affecting Wholesale Rates Does Not Permit It To Regulate Retail Services.................................................................................. 30

        1.    The Statute Prohibits The Commission From Regulating Retail Services....................................... 30

        2.    The Commission's Orders Cite No Case Supporting Its Position. ......................................... 38

C.      The Commission's Orders Unreasonably Interfere With
         The States' Exclusive Jurisdiction Over Retail Services. ............. 41

II.     The Commission's Orders Violate The Federal Power Act
        And The Requirements Of Reasoned Decision-making. ........................ 45

        A.      The Commission's Retail Compensation Scheme Is
                 Unduly Discriminatory And Preferential Because It
                 Overcompensates "Demand Response" Providers. ..................... 45

        B.      The Commission's Orders Depart Without Reasoned
                 Explanation From Precedent Recognizing That Full
                 LMP Pricing Unfairly Subsidizes "Demand Response." ............. 50

        C.      The Commission's Retail Compensation Scheme Is
                 Unjust And Unreasonable Because It Distorts The
                 Market. ................................................................................. 53

        D.      The Commission's Retail Customer Compensation
                 Scheme Is Unjust And Unreasonable Because It Results
                 In Artificially Suppressed Market Prices. ....................................... 56

III.    The Commission's Orders Violate Section 206 By Ordering
        Rate Changes Without First Demonstrating That Existing
        Rates Were Unjust And Unreasonable. ....................................................... 61

CONCLUSION ................................................................................................... 66

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Alabama Elec. Coop., Inc. v. FERC,*
  684 F.2d 20 (D.C. Cir. 1982) .................................................... 46, 49

*Altamont Gas Transmission Co. v. FERC,*
  92 F.3d 1239 (D.C. Cir. 1996). ................................................38

*American Bar Ass'n v. FTC,*
  430 F.3d 457 (D.C. Cir. 2005) ...............................................41

*Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n,*
  461 U.S. 375 (1983) ................................................... 6, 7, 32

*Atlantic City Elec. Co. v. FERC,*
  295 F.3d 1 (D.C. Cir. 2002) .............................................. 27, 61, 63

*Beck v. Prupis,*
  529 U.S. 494 (2000) ................................................................32

*Bonneville Power Admin. v. FERC,*
  422 F.3d 908 (9th Cir. 2005)...................................................41

*Boston Edison Co. v. FERC,*
  233 F.3d 60 (1st Cir. 2000) .......................................................8

*California Indep. Sys. Operator Corp. v. FERC,*
  372 F.3d 395 (D.C. Cir. 2004) ............................................ 9, 31

*Carpenters & Millwrights v. NLRB,*
  481 F.3d 804 (D.C. Cir. 2007) ...............................................26

*Chemehuevi Tribe of Indians v. FPC,*
  420 U.S. 395 (1975) .............................................................35

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.,*
  467 U.S. 837 (1984) .............................................................25

\* Authorities upon which we chiefly rely are marked with asterisks

*City of Vernon, Cal. v. FERC,*
    845 F.2d 1042 (D.C. Cir. 1988) ...................................................42

*City of Winnefeld, La. v. FERC,*
    744 F.2d 871 (D.C. Cir. 1984) .....................................................8

*Comcast Corp. v. FCC,*
    600 F.3d 642 (D.C. Cir. 2010) ...................................................36

*Connecticut Dept. of Pub. Util. Control v. FERC,*
    569 F.3d 477 (D.C. Cir. 2009) ...................................... 15, 38, 39

*Detroit Edison Co. v. FERC,*
    334 F.3d 48 (D.C. Cir. 2003) .....................................................25

*Dynegy Midwest Generation, Inc. v. FERC,*
    633 F.3d 1122 (D.C. Cir. 2011) .................................................49

*Farmers Union Cent. Exch. v. FERC,*
    734 F.2d 1486 (D.C. Cir. 1984) .................................................57

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ...................................................................26

*Florida Gas Transmission Co. v. FERC,*
    604 F.3d 636 (D.C. Cir. 2010) ........................................... 26, 45

*FPC v. Conway Corp.,*
    426 U.S. 271 (1999) ...................................................................31

*FPC v. Hope Natural Gas Co.,*
    320 U.S. 591 (1944) ........................................... 57, 58, 60

*FPC v. Southern Cal. Edison Co.,*
    376 U.S. 205 (1964) ........................................... 6, 27, 30

*General Dynamics Land Sys. Inc. v. Cline,*
    540 U.S. 581 (2004) ...................................................................25

*Grand Council of the Crees v. FERC,*
    198 F.3d 950 (D.C. Cir. 2000) ...................................................60

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ...............................................................32

*Hunt v. Washington State Apple Adver. Comm'n*,
    432 U.S. 333 (1977) .............................................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................24

*Michigan v. EPA*,
    268 F.3d 1075 (D.C. Cir. 2001). ..........................................26

*Morgan Stanley Capital Group Inc. v.*
    *Public Util. Dist. No. 1 of Snohomish Cty.*,
    554 U.S. 527 (2008) ...............................................................9

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v.*
    *State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ...............................................................26

*Munn v. Illinois*,
    94 U.S. 113 (1877) .................................................................7

*National Fuel Gas Supply Corp. v. FERC*,
    468 F.3d 831 (D.C. Cir. 2006) ..............................................64

*New York v. FERC*,
    535 U.S. 1 (2002) ................................................. 7, 9, 28, 35

*Niagara Mohawk Power Corp. v. FERC*,
    452 F.3d 822 (D.C. Cir. 2006). ...............................................7

*NorAm Gas Transmission Co. v. FERC*,
    148 F.3d 1158 (D.C. Cir. 1990) ............................................26

*North Am. Van Lines, Inc. v. NLRB*,
    869 F.2d 596 (D.C. Cir. 1989) ..............................................25

*Panhandle E. Pipe Line Co. v. Public Serv. Comm'n of Ind.*,
    332 U.S. 507 (1947) .............................................................28

*PSEG Energy Res. & Trade LLC v. FERC*,
    665 F.3d 203 (D.C. Cir. 2011) .................................................................52

*Public Utils. Comm'n of Rhode Island v.*
    *Attleboro Steam & Elec. Co.*,
    273 U.S. 83 (1927) ............................................................................ 6, 32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    __ U.S. __, 2012 WL 1912197 (May 29, 2012).........................................31

*Sacramento Mun. Util. Dist. v. FERC*,
    616 F.3d 520 (D.C. Cir. 2010) ................................................. 10, 38, 39, 40

*Sithe/Independence Power Partners, L.P. v. FERC*,
    285 F.3d 1 (D.C. Cir. 2002) .........................................................................11

*Small Refiner Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) .................................................................64

*Transmission Agency of N. Cal. v. FERC*,
    495 F.3d 663 (D.C. Cir. 2007) ............................................................. 25, 41

*United Gas Distribution Cos. v. FERC*,
    88 F.3d 1105 (D.C. Cir. 1996) .............................................................. 38, 40

*\*Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*,
    475 F.3d 319 (D.C. Cir. 2006) .................................................................42

*Wisconsin Pub. Power, Inc. v. FERC*,
    493 F.3d 239 (D.C. Cir. 2007) ......................................................... 10, 11, 58

*Wisconsin Valley Improvement v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001) .................................................................51

**Rules and Administrative Decisions**

*California Elec. Oversight. Bd. v. California Indep. Sys. Operator Corp.*,
    109 FERC ¶ 61,182 (2004).........................................................................58

*Connecticut ex rel. Blumenthal v. ISO New England Inc.*,
    117 FERC ¶ 61,038 (2006).........................................................................58

*Demand Response Compensation*
    *in Organized Wholesale Energy Markets*,
    Notice of Proposed Rulemaking,
    FERC Stats. & Regs. ¶ 32,656 (2010) ............................................ 16, 17, 37

*Demand Response Compensation*
    *in Organized Wholesale Energy Markets*,
    Order No. 745,
    76 Fed. Reg. 16,658 (Mar. 24, 2011),
    FERC Stats. & Regs. ¶ 31,322 (2011) .......................... 1, 12, 14, 17, 18, 19,
                                  20, 21, 28, 29, 33, 36, 37, 43,
                           47, 50, 54, 55, 56, 57, 59, 60, 61, 62, 64

*Demand Response Compensation*
    *in Organized Wholesale Energy Markets*,
    Order No. 745-A,
    137 FERC ¶ 61,215 (2011) ............................................ 1, 21, 30, 33, 37, 38,
                                  41, 42, 44, 46, 48, 49, 51,
                                52, 57, 59, 62, 63, 64, 65

*EnergyConnect, Inc.,*
    130 FERC ¶ 61,031 (2010) ..........................................................................29

*Market-Based Rates for Wholesale Sales of Electric Energy,*
    *Capacity & Ancillary Servs. by Pub. Utils.,*
    Order No. 697-A, FERC Stats. & Regs. ¶ 31,268 (2008) ........................58

*Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.,*
    123 FERC ¶ 61,169,
    *order on reh'g,* 125 FERC ¶ 61,340 (2008) ...................................................58

*PJM Indus. Customer Coal. v. PJM Interconnection, L.L.C.,*
    121 FERC ¶ 61,315 (2007) ..........................................................................51

*PJM Interconnection, L.L.C.,*
    99 FERC ¶ 61,227 (2002) ............................................................................51

*Regional Transmission Orgs.,*
      Order No. 2000,
      FERC Stats. & Regs. ¶ 31,089 (1999).........................................................61

*Wholesale Competition in Regions with Organized Elec. Mkts.,*
      Order No. 719,
      FERC Stats. & Regs. ¶ 31,281 (2008).........................................................16

**Statutes**

16 U.S.C. § 824.........................................................................................3, 7

*16 U.S.C. § 824(a) .................................................. 2, 3, 7, 11, 22, 28, 31

*16 U.S.C. § 824(b)(1) .................................................. 8, 22, 28, 29, 31

16 U.S.C. § 824(f).......................................................................... 7, 28

*16 U.S.C. § 824d.......................................................... 8, 30, 45, 46

16 U.S.C. § 824e.......................................................................... 9, 45, 46

16 U.S.C. § 824h ..........................................................................................31

16 U.S.C. § 824p ..........................................................................................35

16 U.S.C. § 825*l*(b).................................................................... 1, 24

5 U.S.C. § 706(2) .................................................................... 25, 27, 45

Energy Policy Act of 2005,
      Pub. L. No. 109-58, § 1252.........................................................36

**Regulations**

18 C.F.R. § 35.28(b) .................................................................... 15, 29

**Other Authorities**

Department of Energy,
      *Benefits of Demand Response in Electricity Markets*
      *and Recommendations for Achieving Them* (Feb. 2006) .............................13

Department of Energy,
    Database of State Incentives for Renewables and Efficiency ...............34

FERC Staff,
    *2011 Assessment of Demand Response
    and Advanced Metering* (Nov. 2011).........................................................14

FERC Staff,
    *A National Assessment of Demand
    Response Potential* (June 2009) ........................................................... 13, 14

James Bushnell, *et al.,*
    *When It Comes to Demand Response,*
    *Is FERC Its Own Worst Enemy?,*
    The Electricity Journal (Oct. 2009).........................................................15

Massachusetts Institute of Technology,
    *The Future of the Electric Grid* (2011).........................................................13

The Electric Energy Market Competition Task Force,
    *Report to Congress on Competition in Wholesale
    and Retail Markets for Electric Energy* (Apr. 2007)...................................12

William W. Hogan,
    *Implications for Consumers of the NOPR's
    Proposal to Pay the LMP for All Demand Response* (2010) ................ 47, 55

# GLOSSARY OF TERMS

| | |
|---|---|
| APPA | Petitioner American Public Power Association |
| California ISO | California Independent System Operator Corporation |
| CPUC | California Public Utilities Commission |
| Commission | Federal Energy Regulatory Commission |
| Delaware PSC | Delaware Public Service Commission |
| Demand Response | A reduction in the consumption of electric energy by retail customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.   18 C.F.R. § 35.28(b)(4). |
| DOE Report | Department of Energy, *Benefits of Demand Response in Electricity Markets and Recommendations for Achieving Them* (Feb. 2006). |
| EEI | Petitioner Edison Electric Institute |
| EPSA | Petitioner Electric Power Supply Association |
| FERC | Federal Energy Regulatory Commission |
| FTC | Federal Trade Commission |
| Hogan Paper | William W. Hogan, *Implications for Consumers of the NOPR's Proposal to Pay the LMP for All Demand Response* (R.18, Attachment 1) (JA __). |

| | |
|---|---|
| ISO | Independent System Operator — The operator of a regional transmission system that is independent of market participants. *See* RTO. |
| ISO-NE | ISO New England Inc. |
| LMP | Locational marginal price — A measure of the least-cost of meeting an incremental megawatt-hour of demand at each location on the grid. At any given grid location, the LMP has three components: a generation component, a congestion component, and a losses component. |
| LMP-minus-G | A measure of the least-cost of meeting an incremental megawatt-hour of demand at each location on the grid, adjusted to reflect an offset accounting for saved retail generation charges ("G" represents the retail generation charge). |
| Megawatt (MW) | A measure of real power equal to a million watts. |
| Megawatt hour (MWh) | The power utilization for one hour measured in megawatts. |
| MISO | Midwest Independent Transmission System Operator, Inc. |
| NOPR | *Demand Response Compensation in Organized Wholesale Energy Markets*, Notice of Proposed Rulemaking, FERC Stats. & Regs. ¶ 32,656 (2010) (JA ___). |
| NRECA | Petitioner National Rural Electric Cooperative Association |
| ODEC | Petitioner Old Dominion Electric Cooperative |

| | |
|---|---|
| Ohio PUC | Public Utilities Commission of Ohio |
| Order 719 | *Wholesale Competition in Regions with Organized Elec. Mkts.*, Order No. 719, FERC Stats. & Regs. ¶ 31,281 (2008). |
| Order 745 | *Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745, Final Rule, 76 Fed. Reg. 16,658 (Mar. 24, 2011)FERC Stats. & Regs. ¶ 31,322 (Mar. 15, 2011) (JA __). |
| Order 745-A | *Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745-A, Order on Rehearing and Clarification, 137 FERC ¶ 61,215 (Dec. 15, 2011) (JA __). |
| Potomac Economics | Potomac Economics, Ltd. |
| PJM Interconnection | PJM Interconnection, L.L.C. |
| Retail Sales | Sales of electric energy to end-use customers. Such sales are subject to state jurisdiction. |
| RTO | Regional Transmission Organization — An entity responsible for the operation of a regional transmission network. *See* ISO. |
| Tariff | A Commission-approved document stating the rate or rates to be charged by a particular company or utility. |
| Transmission Owner | A transmission-owning utility. The term is used to refer to a transmission-owning utility that has transferred functional control over its transmission facilities to an RTO or ISO and, therefore, is no longer a provider of transmission services. |

| Wholesale Sales | Sales of electric energy to load-serving entities for resale to end-use customers.  Such sales are subject to federal jurisdiction. |
| 2009 National Assessment | FERC Staff, A National Assessment of Demand Response Potential (June 2009). |

## JURISDICTIONAL STATEMENT

On March 15, 2011, the Federal Energy Regulatory Commission issued a final rule requiring that certain retail customers receive compensation for not consuming retail energy under the rules governing certain wholesale markets. *Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745, 76 Fed. Reg. 16,658 (Mar. 24, 2011), FERC Stats. & Regs. ¶ 31,322 ("Order 745"). The Commission denied rehearing on December 15, 2011, *see* Order No. 745-A, 137 FERC ¶ 61,215 ("Order 745-A"), and petitioners filed timely petitions for review. This Court has jurisdiction under 16 U.S.C. § 825*l*(b).

## STATUTORY AND REGULATORY PROVISIONS

The relevant statutory and regulatory provisions are reproduced in the addendum.

## STATEMENT OF ISSUES

1.    Because the Commission has no authority to regulate retail sales and matters "subject to regulation by the States," 16 U.S.C. § 824(a), has the Commission exceeded its statutory authority by requiring that certain retail customers receive payments for reducing their retail purchases of electric energy and treating those reductions in retail consumption as the functional equivalent of producing energy for sale at wholesale?

2.    Has the Commission violated the requirements of the Federal Power Act and of reasoned decision-making (i) by establishing a scheme that overcompensates reductions in retail demand and thereby unduly discriminates in favor of certain retail customers; (ii) by departing from precedent without explaining or even acknowledging the departure; and (iii) by failing to provide a meaningful response to serious objections, including concerns that the Commission's compensation scheme will distort the nation's energy markets and artificially suppress market prices in a manner inconsistent with the Commission's statutory obligation to ensure that rates are just and reasonable for wholesale sales?

3.    Has the Commission violated the Federal Power Act by requiring changes to rates without complying with section 206, which

precludes the Commission from unilaterally modifying rates unless it demonstrates that existing rates are unjust and unreasonable and that its proposed rates are just and reasonable and not unduly discriminatory?

## INTRODUCTION

This consolidated appeal arises out of attempts by the Commission to address perceived inefficiencies resulting from the division of jurisdictional authority between the States and the federal government. State retail rate regulation has a substantial impact on wholesale energy prices because retail prices affect retail customers' demand for electric energy (in industry parlance, "load"), which in turn determines the amount of energy that must be generated and purchased at wholesale by the load-serving entities that serve retail customers. Despite this connection, the Federal Power Act draws a clear jurisdictional line between the regulation of wholesale and retail transactions, granting the Commission exclusive authority over the former, while prohibiting the Commission from interfering with the States' traditional and equally exclusive authority over the latter. *See* 16 U.S.C. §§ 824, 824(a).

In its orders below, the Commission has attempted to circumvent these statutory limits on its authority. In particular, it has sought to interfere

3

with state and local regulation of retail transactions by redefining certain retail customers' decisions not to purchase energy at retail — *i.e.*, reductions in retail customer demand occurring in response to changes in price or other incentives ("demand response") — as equivalent to producing electric energy for sale at wholesale and entitled to compensation as a service provided in the wholesale markets. Moreover, the Commission has ordered that retail customers who reduce their purchases of energy at retail shall be paid the full wholesale rate that generators receive for actually producing electric energy. As numerous experts explained to the Commission, because these retail customers will receive the full wholesale payment in addition to avoiding the associated retail charge, the Commission's approach will over-compensate participating retail customers, unduly discriminate against wholesale power producers, and distort the nation's electricity markets. Nonetheless, in its orders below, the Commission largely ignored these problems and instead concluded that its retail customer compensation scheme is justified on the theory that regulating retail consumption decisions will help address unspecified "market imperfections."

Petitioners are some of the nation's leading energy industry associations. They together represent the diverse interests of almost all

4

major wholesale market participants, including shareholder-owned electric utilities, community-owned electric utilities, competitive power suppliers, and not-for-profit rural electric cooperatives and public power districts. Although petitioners have a common interest in eliminating undue discrimination and ensuring that reliable supplies of electric energy are available at just and reasonable prices, they have vastly differing perspectives on how best to achieve these goals, even differing on questions as fundamental as the appropriateness of the Commission's market-based rate program. Petitioners' interests are rarely aligned when it comes to questions concerning the regulation of the nation's wholesale energy markets.

Nonetheless, as a clear sign of how far the Commission's orders have gone astray, petitioners are taking the unusual step of submitting this joint brief. Petitioners share concerns about the Commission's unlawful and unreasoned approach to paying retail customers for reducing retail consumption.[1] As described in more detail below, the Commission's orders

---

[1] With one exception: Petitioners American Public Power Association, National Rural Electric Cooperative Association, and Old Dominion

should be reversed and vacated because they exceed the Commission's jurisdiction, are inconsistent with the Federal Power Act's mandates, and do not comply with the requirements of reasoned decision-making.

## STATEMENT OF CASE AND FACTS

### A.    The Federal Power Act

When Congress enacted the Federal Power Act it reaffirmed, consistent with Supreme Court precedent, the "bright line" distinction "between state and federal jurisdiction" over the electric power industry. *FPC v. Southern Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964); *see also Public Utils. Comm'n of Rhode Island v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927). Simply put, the statute provides that "retail" sales of electric energy remain subject to exclusive state regulation, as they were before Congress enacted the Federal Power Act, while wholesale sales and transmission of electric energy are subject to the Commission's exclusive jurisdiction. *See Arkansas Elec. Coop. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983).

The Federal Power Act thus reserves to the States jurisdiction over sales of energy at retail and expressly prohibits the Commission from

---

Electric Cooperative do not join in section II.D. of this brief (or the summary of argument relating to that section).

regulating matters, such as retail services, that "are subject to regulation by the States." 16 U.S.C. §§ 824, 824(a); *see also New York v. FERC*, 535 U.S. 1, 20 (2002) (the Commission's "jurisdiction over the *sale* of power has been specifically confined to the wholesale market") (emphasis in original). As this Court has recognized, the States "retain jurisdiction over retail sales of electricity and over local distribution facilities." *Niagara Mohawk Power Corp. v. FERC*, 452 F.3d 822, 824  (D.C. Cir. 2006). The statute similarly excludes from the Commission's ratemaking jurisdiction certain electric entities that often make retail sales, including "any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936, or that sells less than 4,000,000 megawatt hours of electricity per year," or any instrumentality or agency of any of the foregoing. 16 U.S.C. § 824(f). By leaving undisturbed state and local authority over these matters, Congress preserved "one of the most important of the functions traditionally associated with the police power of the States." *Arkansas Elec.*, 461 U.S. at 377 (citing *Munn v. Illinois*, 94 U.S. 113 (1877)).

In contrast, the Federal Power Act grants the Commission exclusive jurisdiction over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." 16

7

U.S.C. § 824(b)(1). The Commission oversees "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(a). Moreover, the statute's section 205 tasks the Commission with ensuring that all wholesale rates and charges, as well as "all rules and regulations affecting or pertaining to such rates or charges," are just and reasonable and not unduly preferential or discriminatory. *Id*. §§ 824d(a), 824d(b).

Significantly, Congress granted regulated sellers authority to "set[] the rates in the first instance" under section 205. *Boston Edison Co. v. FERC*, 233 F.3d 60, 64 (1st Cir. 2000). The Federal Power Act thus directs that, "[u]nless the Commission otherwise orders," rates and charges become automatically effective and presumptively lawful once they are accepted for filing. 16 U.S.C. § 824d(d); *see also Alabama Power Co. v. FERC*, 22 F.3d 270, 271 (11th Cir. 1994). Moreover, once a rate is accepted and in force, the Commission has no authority to order changes to the rate unless it first complies with the requirements of section 206. *City of Winnefeld, La. v. FERC*, 744 F.2d 871, 875 (D.C. Cir. 1984). Section 206 permits the Commission to modify existing rates currently "in force" only if they can be shown to have become "unjust,

8

unreasonable, unduly discriminatory or preferential."  16 U.S.C. § 824e(a);

*see generally Morgan Stanley Capital Group Inc. v. Public Util. Dist. No. 1 of*

*Snohomish Cty.,* 554 U.S. 527 (2008).

### B.    The Organized Wholesale Markets

For most of the last century, power markets were dominated by

vertically integrated utilities that served as "local monopolies subject to state

or local regulation."  *New York*, 535 U.S. at 5.  In recent decades, however,

Congress and the Commission have taken steps seeking to facilitate greater

competition in the nation's wholesale power markets.  *Id.* at 8.  As part of

these initiatives, the Commission has sought to lower barriers to entry by

encouraging utilities to transfer control over their transmission facilities to

independent public utility entities, known as independent system operators

("ISOs") and regional transmission organizations ("RTOs").

ISOs and RTOs are responsible for administering organized, bid-based

markets for wholesale electricity and for ensuring that participants within

those markets have access to the transmission system on a non-

discriminatory basis.  *See California Indep. Sys. Operator Corp. v. FERC*, 372

F.3d 395, 397 (D.C. Cir. 2004).  The wholesale markets administered by the

ISOs and RTOs allow energy suppliers (*e.g.*, electric generators) to sell the

9

power they produce at wholesale rates to load-serving entities, which then resell the power to retail customers at retail rates. *See Wisconsin Pub. Power, Inc. v. FERC*, 493 F.3d 239 (D.C. Cir. 2007).

Within the ISO-/RTO-operated wholesale markets, electric energy is sold on a real-time and day-ahead basis, and the rates at which energy is bought and sold are subject to the Commission's oversight. In simple terms, these wholesale markets work as follows: to balance supply and demand an ISO/RTO will accept offers to sell energy in ascending price order (from the lowest offer to the highest) until the market clears, meaning that all demand for energy has been met. When the market clears, all sellers whose offers have been accepted are paid for the energy they supply at the market-clearing price.

For most ISOs and RTOs, the market-clearing price reflects the use of the "locational marginal price" ("LMP") model. The LMP represents "the least-cost of meeting an incremental megawatt-hour of demand at each location on the grid." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 524 (D.C. Cir. 2010). At any given grid location, the LMP has three components: (1) a generation component, which is intended to capture "the baseline cost of serving load anywhere on the system in the absence of congestion and

10

transmission losses," *id.*; (2) a congestion component, "which takes into account the limits on available transmission capacity" and thus "results in higher energy prices at [locations] that require the use of congested transmission lines and lower prices in less congested areas," *Wisconsin Pub. Power*, 493 F.3d at 250; and (3) a losses component, which accounts for the cost associated with "the amount of electric energy lost when electricity flows across a transmission system." *Sithe/Independence Power Partners, L.P. v. FERC*, 285 F.3d 1, 2 (D.C. Cir. 2002). LMPs are calculated for intervals of an hour, or even less in some wholesale markets, and thus reflect fluctuations in the marginal cost of production at each location throughout the day.

### C.    The Relationship Between Wholesale And Retail Rates

Retail customers purchase energy at state-regulated rates from load-serving entities, which have either purchased energy in the wholesale markets or generated it with their own units. These retail transactions, and the rates at which retail customers purchase energy from load-serving entities, are not regulated by the Commission. They are instead "subject to regulation by the States." 16 U.S.C. § 824(a).

Because electric energy, unlike most other commodities, cannot be stored, there is a direct relationship between, on one hand, the volume of sales made to retail customers and, on the other, the volume of energy generated and purchased at wholesale by load-serving entities. For example, although demand for electricity may be relatively "inelastic" with respect to price, retail customers will purchase less energy from load-serving entities when retail prices increase. *See* The Electric Energy Market Competition Task Force, *Report to Congress on Competition in Wholesale and Retail Markets for Electric Energy*, at 48 (Apr. 2007), *available at* http://www. ferc.gov/legal/fed-sta/ene-pol-act/epact-final-rpt.pdf. These retail consumption decisions thus translate directly into the "demand" (*i.e.*, "load") that load-serving entities must meet either through additional purchases in the wholesale markets or through their own generation. *Id.* at 6.

Although retail and wholesale rates are linked, because of the bifurcated regulatory structure imposed by Congress, there is typically no connection between retail prices at any particular time and location and wholesale prices at that same time and location. *See* Order 745, at P 57 (JA __). Retail rates typically do not adjust on an hour-by-hour basis and do

not track price fluctuations in the wholesale markets. *See id*. at 31,271 (Comm'r Moeller, dissenting) (JA ___); Department of Energy, *Benefits of Demand Response in Electricity Markets and Recommendations for Achieving Them*, at 7 (Feb. 2006) ("DOE Report"), *available at* http://energy.gov/sites/ prod/files/oeprod/DocumentsandMedia/DOE_Benefits_of_Demand_Resp onse_in_Electricity_Markets_and_Recommendations_for_Achieving_Them _Report_to_Congress.pdf (same).    In fact, many states and local governments have chosen to keep retail rates fixed because "customers do not like price volatility" and because there is a lack of advanced metering technology that would provide retail customers with more accurate price signals.  FERC Staff, *A National Assessment of Demand Response Potential*, at 189 (June 2009) ("2009 National Assessment"), *available at* http://www.ferc. gov/legal/staff-reports/06-09-demand-response.pdf; *see also* Massachusetts Institute of Technology, *The Future of the Electric Grid*, at 143-45 (2011), *available at* http://web.mit.edu/mitei/research/studies/documents/electric- grid-2011/Electric_Grid_Full_Report.pdf.  As a result, retail customers often do not see, and cannot adjust retail consumption in response to, the hourly (and often even more frequent) fluctuations in wholesale prices.  *See* 2009 National Assessment at 189; *see also* DOE Report at 7 (describing "disconnect

between short-term marginal electricity production costs and retail rates paid by consumers").

Recognizing the inefficiency of this disconnect between wholesale and retail prices, some states and local governments have chosen to implement "dynamic pricing" models, promote advanced metering technology, and establish other regulatory programs to allow retail rates to more closely track price fluctuations in the wholesale markets. *See* 2009 National Assessment at 21-22 (describing these programs); *id.* at 79 (Appendix A) (analysis of existing programs); FERC Staff, *2011 Assessment of Demand Response and Advanced Metering* at 4-6 (Nov. 2011) (describing state legislative and regulatory activity), *available at* http://www.ferc.gov/legal/ staff-reports/11-07-11-demand-response. pdf; R.83 at 5-6 (APPA, *et al.*) (JA ___) (describing efforts undertaken by non-jurisdictional load-serving entities); Order 745, at P 9 (JA ___).  Significantly, however, some states and local governments have chosen ***not*** to implement retail programs that would make retail pricing more dynamic or responsive to changes in wholesale prices. *See* 2009 National Assessment at 38.  These choices reflect local policy judgments about how best to protect consumers and to regulate retail rates.

### D.    The Commission's Orders

Dissatisfied with state and local government efforts to allow retail customers to respond to fluctuations in wholesale prices, the Commission has recently sought to influence retail consumption decisions directly by encouraging what it refers to as "demand response."  The term is part of that language this Court has come to know as "FERC-speak."  *Connecticut Dept. of Pub. Util. Control v. FERC*, 569 F.3d 477, 481 (D.C. Cir. 2009).  In plain English, "demand response" refers to the basic economic phenomenon that when electricity prices go up customers demand less of it.  *See* James Bushnell, *et al.*, *When It Comes to Demand Response, Is FERC Its Own Worst Enemy?*, The Electricity Journal, at 11 (Oct. 2009) ("One rarely hears the term used outside of the electricity industry because the notion that consumers must pay and make decisions based on a real-time price is a fact of life in all industries without explicit price regulation.").  More specifically, the Commission defines "demand response" as "a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy."  18 C.F.R. § 35.28(b)(4).

Although the Commission is not empowered to regulate retail sales, it decided to regulate "demand response" by redefining retail non-purchases as a wholesale service. In particular, the Commission concluded that a retail customer's decision not to purchase energy at retail should be treated as a wholesale service that is equivalent to generating energy and making it available for sale at wholesale. Accordingly, in earlier orders the Commission directed ISOs and RTOs to allow retail customers, either directly or through an intermediary, to offer "demand response" into wholesale markets in certain circumstances and to treat "demand response" "comparably to other resources." *Wholesale Competition in Regions with Organized Elec. Mkts.*, Order No. 719, FERC Stats. & Regs. ¶ 31,281 at P 15 (2008) ("Order 719"). Working with stakeholders in their respective regions, ISOs and RTOs developed, and the Commission approved, tariff changes designed to allow retail customers to participate directly in organized wholesale markets as purported energy suppliers. *Demand Response Compensation in Organized Wholesale Energy Markets*, Notice of Proposed Rulemaking, FERC Stats. & Regs. ¶ 32,656 at P 7 (2010) (JA ___) ("NOPR"). In the wake of these orders, each ISO or RTO developed "its own

16

compensation methodologies" tailored to the specific circumstances of its individual market and filed them with the Commission.  *Id.* at P 8 (JA __).

The Commission initially accepted these filings.  On March 18, 2010, however, the Commission issued a notice of proposed rulemaking, expressing its dissatisfaction with the fact that "demand response providers" — *i.e.*, retail customers, directly and through their agents — were "collectively" playing only "a small role in wholesale markets."  *Id.* at P 9 (JA __).  Asserting that "some existing, inadequate compensation structures have hindered the development and use of demand response," *id.*, the Commission proposed to adopt a uniform requirement that all ISOs and RTOs pay retail customers the full wholesale LMP for agreeing to reduce their purchases of energy at retail.  *Id.* at P 1 (JA __).

Thousands of pages of comments were filed in response to this proposal.  Order 745, at P 1 (JA __).  The bulk of these comments, representing an unusually broad spectrum of interests, opposed the Commission's attempt to assert jurisdiction over retail service by redefining reductions in retail consumption as providing a wholesale service.  *Id.* at PP 103-14 (JA __).  Comments also expressed concern that a "one size fits all" approach would fail to account for regional differences and would be

incompatible with state and utility efforts to develop policies and programs for regulating retail "demand response." *Id.* at P 44 (JA __); *see also* R.91 at 5-8 (CPUC). Finally, comments objected that the full LMP payments contemplated by the Commission would over-compensate certain retail customers because they would receive both a reduction in their retail payments as well as a payment for reducing demand, which would inject distortions into the organized wholesale energy markets. Order 745, at PP 22-27 (JA __).

On March 15, 2011, the Commission issued Order 745 requiring ISOs and RTOs to pay retail customers the market price for wholesale energy (the full LMP) in return for commitments to reduce retail consumption. The Commission asserted jurisdiction on the theory that compensating certain retail customers to reduce their retail purchases is purportedly a "practice" that affects wholesale rates within the meaning of section 205(a) of the Federal Power Act. *Id.* at P 125 (JA __). Based on its belief that "demand response can balance supply and demand as can generation," *id.* at P 55 (JA __), the Commission held that reductions in retail consumption by retail customers should be treated as equivalent to production of energy by generators at wholesale. *Id.* at P 53 (JA __). The Commission thus directed

18

that "demand response resources that clear in the day-ahead and real-time energy markets should receive the LMP for services provided, as do generation resources." *Id.*

The Commission conditioned the payment of full LMP to retail customers on the "demand response" being "able to displace a generation resource" and allowing the ISO or RTO to "balanc[e] supply and demand." *Id.* at P 48 (JA __). In addition, the Commission required "demand response" to be "cost-effective," as determined by a newly devised "net benefits test." *Id.* That test requires that "demand response" providers "be paid LMP only when the benefits of demand response compensation outweigh the energy market costs to consumers of paying demand response resources." *Id.* at P 28 (JA __).

This condition sprung from the Commission's recognition that paying full LMP to retail customers for reducing retail purchases creates a revenue shortfall in the wholesale market. *See id.* at PP 50-52 (JA __). A shortfall occurs because the quantity of power purchased by load-serving entities participating in the wholesale market is based on the aggregate demand of their retail customers. When one of those retail customers provides "demand response," the load-serving entity's aggregate demand (load) goes

19

down, reducing its wholesale purchases and the amount that must be paid to generators for supplying power in equal amounts. As the Commission acknowledged, paying retail customers to consume less energy would result in a "difference between the amount owed by the RTO to resources, including demand response providers," and the revenues the RTO could collect from load-serving entities, creating a "negative balance" that would have to be recovered from load-serving entities participating in the wholesale market. *Id*. at P 99 (JA __); *see also id*. at P 102 (JA __).

In a strongly worded dissent, Commissioner Moeller stated that the Commission's retail customer compensation scheme "conflicts both with the Commission's efforts to promote competitive markets and with its statutory mandate to ensure supplies of electric energy at just, reasonable, and not unduly discriminatory or preferential rates." *Id*. at 31,268 (Comm'r Moeller, dissenting) (JA __). Among other things, Commissioner Moeller noted that paying retail customers full LMP for reducing consumption "results in over-compensation that is economically inefficient, preferential to demand resources, and unduly discriminatory towards other market resources." *Id*. at 31,269 (Comm'r Moeller, dissenting) (JA __). Referring to the net benefits test adopted by the Commission to address the imbalance between

20

payments and receipts, Commissioner Moeller objected that the Commission disregarded concerns identified by a "clear majority" of the panel of experts the Commission had convened at a technical conference to opine on the "net benefits approach." *Id*. Commissioner Moeller also objected that the use of a "net benefits test" is "troubling" because it "will only distort price signals" and "can be viewed as somehow equating the concept of a just and reasonable rate with a lower price." *Id*. at 31,270 (Comm'r Moeller, dissenting) (JA __).

Requests for rehearing of Order 745 were filed by numerous parties, including ISOs/RTOs, suppliers, state regulatory commissions, trade associations, publicly owned utilities, rural cooperatives, and transmission owners. *See* Order 745-A, at P 6 (JA __). On December 15, 2011, with Commissioner Moeller again dissenting, the Commission generally denied the rehearing requests and granted clarification on certain issues.

## SUMMARY OF ARGUMENT

1.     The Commission's orders exceed the agency's statutory authority because they regulate retail services, which are expressly subject only "to regulation by the States."   16 U.S.C. §§ 824(a), 824(b)(1).   In particular, the Commission's orders directly regulate retail transactions by requiring that retail customers receive payment for reducing their retail purchases of electricity, and then treating those reductions in retail consumption as equivalent to supplying energy for sale at wholesale.  The plain language of the Federal Power Act reserving jurisdiction over retail service to the States, an area in which the States have traditionally exercised exclusive regulation, trumps the Commission's claim of authority to regulate "demand response" as a "practice" affecting wholesale service. Moreover, the Commission's interpretation of the statutory requirements is unreasonable and arbitrary because the Commission failed to consider the impact its orders will have on existing state "demand response" programs, which the Commission concedes the States are empowered to adopt.

2.     The Commission's orders also violate the Federal Power Act's requirements that rates be just and reasonable and not unduly preferential or discriminatory, and are not the product of reasoned decision-making.

*First*, the Commission's compensation scheme over-compensates retail customers who agree to reduce their retail purchases by paying them the full LMP for forgoing retail purchases without accounting for the savings associated with avoiding retail generation costs.  By failing to account for the avoided retail charge, the Commission's scheme unduly prefers "demand response" providers and unduly discriminates against other market participants.  *Second*, the Commission's orders arbitrarily depart without acknowledgment or reasoned explanation from precedent recognizing that paying retail customers the full LMP for forgoing retail purchases results in an unwarranted "subsidy."  *Third*, the Commission's orders violate the statutory requirements because they do not meaningfully address arguments and evidence that the Commission's compensation scheme will distort the markets by encouraging retail customers to reduce their retail consumption below efficient levels.  *Fourth*, the Commission's orders impermissibly equate lower prices with "just and reasonable" rates and fail to address evidence that artificially lowering prices will interfere with existing market power requirements and potentially result in the over-mitigation of generator market power.

3.    The Commission's orders are invalid because they prescribe changes to existing rate tariffs without making the required findings under section 206 of the Federal Power Act that existing rates are unjust and unreasonable.

## STANDING

Petitioners and their members are aggrieved by the orders below, they satisfy the requirements of 16 U.S.C. § 825*l*(b), and their associational standing is self-evident.  *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977).  The Commission's orders are causing injury in fact because, among other things, they exceed the Commission's jurisdiction, deprive petitioners and their members of the statutory right to non-discriminatory treatment, and directly affect the compensation their members receive for generating energy for transmission and sale at wholesale.  The Court can redress these concrete injuries by reversing the Commission's orders, preventing the Commission from exceeding its statutory authority, and requiring the Commission to comply with the requirements of reasoned decision-making. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Petitioners participated in the proceedings below and their interests fall within the zone of interests protected by the Federal

Power Act. *Transmission Agency of N. Cal. v. FERC*, 495 F.3d 663, 669-70 (D.C. Cir. 2007).

## STANDARD OF REVIEW

The Commission's interpretation of the Federal Power Act is subject to the familiar two-step analysis in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843 (1984). *See Detroit Edison Co. v. FERC*, 334 F.3d 48, 53 (D.C. Cir. 2003). The Court should defer to an agency's statutory interpretation "only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent." *General Dynamics Land Sys. Inc. v. Cline*, 540 U.S. 581, 600 (2004). Moreover, where (as here) "general principles of the law" are applied to undisputed jurisdictional facts, the Court need not afford the agency's decision special deference. *North Am. Van Lines, Inc. v. NLRB*, 869 F.2d 596, 598 (D.C. Cir. 1989).

Under the Administrative Procedure Act, the Commission's orders should be struck down if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is "plainly contrary to law and cannot stand" if it exceeds the agency's statutory authorization. *Michigan v. EPA*, 268 F.3d 1075, 1081

25

(D.C. Cir. 2001). Moreover, an agency violates the requirements of reasoned decision-making if it fails to articulate a "rational connection between the facts found and the choice made," *Florida Gas Transmission Co. v. FERC*, 604 F.3d 636, 639 (D.C. Cir. 2010); departs from precedent without reasoned explanation, *see FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009); or fails "to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency must "engage the arguments raised before it," *NorAm Gas Transmission Co. v. FERC*, 148 F.3d 1158, 1165 (D.C. Cir. 1990), and "explain why it rejected evidence that is contrary to its findings." *Carpenters & Millwrights v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007).

## ARGUMENT

### I.   The Commission's Orders Exceed Its Statutory Authority.

The Commission's orders are "in excess" of its "statutory jurisdiction" and should be held "unlawful and set aside."  5 U.S.C. §§ 706(2), (2)(C).  The Commission cannot circumvent the limits on its authority by paying certain retail customers to reduce the amount of electricity they purchase at retail and then redefining those reductions in retail sales as a "wholesale service."

### A.   The Federal Power Act Prohibits The Commission From Regulating Retail Services.

As a "creature of statute," the Commission possesses only the authority that Congress has conferred upon it; "if there is no statute conferring authority," the Commission "has none."  *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002).  It is therefore significant — indeed, dispositive — that although Congress granted the Commission "plenary" jurisdiction over rates for wholesale sales in interstate commerce, it expressly withheld authority to interfere with the States' jurisdiction over retail sales.  *Southern Cal. Edison*, 376 U.S. at 215-16.  The Federal Power Act limits the Commission's jurisdiction to "the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce," and forbids the Commission from regulating "any

27

other sale of electric energy," 16 U.S.C. § 824(b)(1), including transactions "subject to regulation by the States." *Id*. § 824(a); *see also id*. § 824(f) (identifying entities exempt from the Commission's jurisdiction). Congress has thus drawn a "clear and complete" line that "cut[s] sharply and cleanly between sales for resale and direct sales for consumptive uses." *Panhandle E. Pipe Line Co. v. Public Serv. Comm'n of Ind.*, 332 U.S. 507, 517 (1947); *see also New York*, 535 U.S. at 19 (Commission's "jurisdiction over the *sale* of power has been specifically confined to the wholesale market").

In its orders below, the Commission crossed this line. Although the Commission's orders refer obliquely to "demand response resources" that participate "as supply resources in the organized wholesale electricity markets," Order 745, at P 62 (JA __), this jargon cannot obscure reality: The Commission has ordered ISOs and RTOs to pay **retail customers** for reducing their **retail purchases** of electricity. *See id.* at PP 86-87 (JA __). The "services" the Commission seeks to regulate are thus precisely the types of retail sales of electric energy that are "subject to regulation by the States." 16 U.S.C. §§ 824(a), (b)(1).

Any doubt on this score is confirmed by the Commission's own regulations. Those regulations define "demand response" as "a reduction in

28

the consumption of electric energy by customers," 18 C.F.R. § 35.28(b)(4), making clear that "demand response" involves neither a transmission nor a wholesale sale of electricity over which the Commission has authority. 16 U.S.C. § 824(b)(1). The Commission conceded as much below, stating that it "does not view demand response as a resale of energy back into the [wholesale] energy market." Order 745, at P 64 (JA ___). As the Commission has previously held, an entity that provides only "demand response" service does "not own or operate facilities that are subject to the Commission's jurisdiction" and therefore is not "a public utility that is required to have a rate on file with the Commission." *EnergyConnect, Inc.*, 130 FERC ¶ 61,031 at P 30 (2010) (contrasting "agreements not to purchase electric energy" with "agreements to sell electric energy at wholesale"). Indeed, "demand response" is the polar opposite of a wholesale sale: Rather than selling energy at wholesale, a "demand response provider" — a retail customer — is electing not to purchase energy at retail, thereby forgoing the payment of a retail rate regulated by a state or local government.

If one accepts the notion that a retail customer's decision to reduce its purchases of retail service is equivalent to a sale of energy at wholesale, it follows that an increase in a retail customer's retail purchases (*i.e.*, demand)

is equivalent to a purchase of energy in the wholesale market. The Commission's logic thus leads ineluctably to the conclusion that the Commission has authority to regulate both purchases and sales of energy at the retail level. This directly interferes with the States' exclusive authority and erases the "bright line" between federal and state jurisdiction that Congress drew. *Southern Cal. Edison*, 376 U.S. at 215.

## B. The Commission's Authority Over Practices Affecting Wholesale Rates Does Not Permit It To Regulate Retail Services.

Although it concedes that retail customers are not "public utilit[ies]" and do not make "wholesale sales of electric energy," Order 745-A, at P 22 (JA __), the Commission claims jurisdiction over "demand response" as "a practice that affects rates in organized wholesale electric markets under sections 205(a) and (c) and section 206(a) of the" Federal Power Act. *Id*. at P 22 (JA __) (citation omitted). The Commission's position does not withstand scrutiny.

### 1. The Statute Prohibits The Commission From Regulating Retail Services.

No one disputes that the Commission has authority to regulate practices affecting wholesale rates. 16 U.S.C. § 824d. But this authority cannot and does not extend so far as to allow the Commission to regulate

30

directly the retail services that are expressly carved out from the scope of its jurisdiction. 16 U.S.C. §§ 824(a), (b)(1); *see also California ISO*, 372 F.3d at 399-402 (rejecting similar attempt to expand the Commission's jurisdiction). Congress carefully structured the statute to "foreclose the possibility that the Commission would ... regulat[e] the nonjurisdictional, retail price." *FPC v. Conway Corp.*, 426 U.S. 271, 276-77 (1999). This specific limit on the Commission's authority to regulate retail services trumps the more general authorization to regulate practices affecting wholesale rates. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, __ U.S. __, 2012 WL 1912197, at *4-*5 (May 29, 2012).

Nor can the Commission obliterate the jurisdictional boundary set by Congress merely because it is concerned about what it refers to as the "direct and substantial" link between retail consumption and wholesale prices. Order 745-A, at P 31 (JA __). Congress obviously knew about this link when it enacted the Federal Power Act. *See*, *e.g.*, 16 U.S.C. § 824h(b) (authorizing the Commission to "confer" with state commissions "regarding the relationship between rate structures ... practices ... and regulations of public utilities"). Indeed, it was that same link between wholesale and retail prices that prompted state efforts to regulate wholesale sales that the Supreme

Court struck down in *Attleboro*. *See* 273 U.S. 83. And it was the desire to "fill the gap" in regulation of electric utilities revealed by *Attleboro* that, in turn, led Congress to enact the Federal Power Act. *Arkansas Elec.*, 461 U.S. at 379.

In any event, requiring ISOs and RTOs to pay retail consumers not to purchase electricity at retail directly regulates (and has the intended purpose of regulating) retail services. By contrast, any effect on wholesale sales is secondary; it occurs only by virtue of the primary effect on retail consumption. Although retail consumption and wholesale prices are to some extent linked, that linkage does not and cannot empower the Commission to regulate retail sales as a "practice" affecting the wholesale market.

The fundamental problem with the Commission's approach is that it reads the "affecting" clauses of sections 205 and 206 as nullifying the limitations on the Commission's jurisdiction set forth in section 201. But a statute's terms "should not be construed so as to render any provision of that statute meaningless or superfluous." *Beck v. Prupis*, 529 U.S. 494, 506 (2000); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004). If the Commission can regulate "demand response" by re-defining reductions in retail sales as a wholesale service, Congress's reservation of retail regulation to the States is

32

meaningless. Indeed, the Commission's expansive interpretation of its "affecting" jurisdiction would allow it to regulate any number of activities — such as the purchase or sale of steel, fuel, labor, and other inputs influencing the cost to generate or transmit electricity — merely by re-defining the activities as "practices" that affect wholesale rates. The Commission itself has recognized that such activities fall outside its jurisdiction. *Cf.* Order 745, at P 31 (JA __); Order 745-A, at PP 29-31 (JA __).

The Commission defends its power grab by arguing that "demand response" is unique because a "properly functioning market should reflect both the willingness of sellers to sell at a price and the willingness of buyers to purchase at a price," and compensating retail customers provides a way for them "to indicate the price at which they are willing to stop consumption." Order 745-A, at P 30 (JA ___). In the Commission's view, "demand response" is different from other retail transactions because, by offering "demand response," retail customers become "direct participants in the organized wholesale energy markets." *Id.* at P 31 (JA __).

This reasoning is circular and irreconcilable with the statutory requirements. Retail customers are participating in the wholesale markets only because the Commission has brought them into the markets by creating

its retail compensation scheme and ordering generous payments for reductions in retail purchases. But that does not transform their retail non-purchases into wholesale sales subject to the Commission's jurisdiction. To the contrary, all retail consumption decisions, and the prices set by state regulators for retail service that impact those decisions, have an effect on the wholesale market. If the Commission were correct, all state ratemaking decisions that affect the level of consumption in the retail markets would potentially become subject to the Commission's jurisdiction as "practices" affecting wholesale rates. For example, more than 30 states have adopted laws requiring utilities to use renewable power for certain percentages of their retail load, which has a "direct effect" on the wholesale market by changing the demand for different sources of power. *See*, *e.g.*, Department of Energy, Database of State Incentives for Renewables and Efficiency, *available at* http://www.dsireusa.org/summarymaps/index.cfm?ee=1&RE =1. Notwithstanding this direct effect, the Commission has no authority to regulate these programs..

So too here. The buyers in ISO-/RTO-operated markets are load-serving entities, not retail customers. If directed by state regulators, or on their own initiative, load-serving entities can and in many instances do

34

respond to changes in wholesale prices by operating their own retail "demand response" programs. But these retail programs are regulated by states and local governments, for Congress granted the States exclusive authority to determine how best to protect retail customers from price volatility. Only Congress can alter the Federal Power Act's assignment of responsibility. *See Chemehuevi Tribe of Indians v. FPC*, 420 U.S. 395, 424 (1975); *New York*, 535 U.S. at 18.

Significantly, in circumstances where state inaction adversely impacts interstate commerce, Congress has not hesitated to extend the Commission's jurisdiction into areas traditionally reserved to the States. For example, in the Energy Policy Act of 2005, Congress did just that when it granted the Commission backstop authority over the siting of electric transmission facilities in circumstances where prolonged state inaction had prevented the development of the interstate transmission grid. *See* 16 U.S.C. § 824p(b)(1)(C) (permitting the Commission to issue permits where the State regulatory authority has "withheld approval for more than 1 year after the filing of an application seeking approval"). Congress has granted the Commission no similar authority over "demand response" or any other aspect of retail sales.

35

In fact, contrary to the Commission's position, Congress has recently confirmed that the Commission does not have authority over "demand response." While the Commission's orders emphasize that section 1252 of the Energy Policy Act of 2005 made promoting "demand response" a "national policy," Order 745, at P 11 & n21 (JA __), the operative provisions of that same section recognize that "demand response" is a matter of state concern, "encourag[ing] States to coordinate, on a regional basis, State energy policies to provide reliable and affordable demand response services to the public" and directing the federal Secretary of Energy to provide "technical assistance to States ... to assist them" with these efforts. Energy Policy Act of 2005, Pub. L. No. 109-58, § 1252(e)(1), (2); *see also id*. § 1252(a), (b), (g), (h), (i) (making revisions to ratemaking standards to be considered by state regulatory authorities in retail ratemaking). Far from granting the Commission new authority to interfere with state regulation of "demand response," section 1252 assigned the Commission the purely advisory role of preparing a report "that assesses demand response resources, including those available from all consumer classes ...." *Id*. § 1252(e); *see also Comcast Corp. v. FCC*, 600 F.3d 642, 654 (D.C. Cir. 2010) ("Policy statements are just that — statements of policy. They are not delegations of authority.").

36

The Commission pays lip service to "the confines of [its] statutory authority," insisting that it is not seeking to "usurp[] or imped[e] state regulatory efforts concerning demand response."  Order 745, at PP 114-115 (JA __).  But the Commission plainly understood its orders as a response to perceived deficiencies in existing state policies.  For instance, although it recognized that some states and local governments have taken steps to develop "price-responsive demand," *id.* at P 9, the Commission noted that "demand response quite simply will not occur without adequate compensation."  NOPR, FERC Stats. & Regs. ¶ 32,656 at P 9 (JA __); *see also* R.153 at Tr. 234:5-8 (Chairman Wellinghoff) (JA __) ("I have no assurances as to when the States will put dynamic retail prices with the controversies that are going on, all the political problems with getting those in place").  According to the Commission, requiring ISOs and RTOs to pay retail customers the full LMP will "help address the lack of a direct connection between wholesale and retail prices and the lack of dynamic retail prices by providing … the accurate price signal for [demand] response."  Order 745-A, at P 61 (JA __).

The Commission's approach thus joins two things Congress kept separate, conflating wholesale and retail jurisdiction in a way that allows the

Commission to regulate both.  In so doing, the Commission has tried to bypass state and local authority over retail sales, violating the principle that the Commission may not "do indirectly what it [may] not do directly." *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1248 (D.C. Cir. 1996).

## 2.    The Commission's Orders Cite No Case Supporting Its Position.

In support of its claimed jurisdiction over retail consumption decisions "affecting" wholesale rates, the Commission points to this Court's decisions in *Connecticut Department of Public Utility Control v.* FERC, 569 F.3d 477 (D.C. Cir. 2009), *Sacramento Municipal Utility District v. FERC*, 616 F.3d 520 (D.C. Cir. 2010), and *United Gas Distribution Cos. v. FERC*, 88 F.3d 1105 (D.C. Cir. 1996).  *See* Order 745-A, at PP 25, 28 (JA __).  Each of these cases, however, involved matters falling within the Commission's jurisdiction in the first instance and held that incidental effects on state regulation or non-jurisdictional utilities were acceptable.  None of the cases stands for the proposition that the Commission may regulate retail services or otherwise bears the weight the Commission has asked it to carry.

In *Connecticut Department of Public Utility Control*, the Court upheld the Commission's jurisdiction to approve an "installed capacity requirement"

used in the New England capacity market, finding no impermissible intrusion on state jurisdiction over electric generation facilities.  As the Court noted, this "woefully misnamed" market design element did not "actually 'require' anyone to 'install' any new 'capacity' at all."   569 F.3d at 481. Because the Commission had undisputed authority to regulate ***directly*** by "'determin[ing] just and reasonable capacity charges' and …. set[ting] those charges so as to incentivize the procurement or creation of additional capacity to ensure system reliability," *id.*, the Court held that the Commission also had the authority to regulate "indirectly by setting a target for capacity demand and using a market mechanism to locate the price appropriate to that quantity."  *Id.* at 482.   Here, in stark contrast, the Commission's orders are directly setting prices for retail sales, a matter that Congress expressly reserved to the States.

The Commission also relies on *Sacramento*, which upheld the "Commission's jurisdiction to impose marginal line losses on a non-public utility" over objections that the relevant tariff was regulating the terms and conditions of a non-public utility's non-jurisdictional transmission facilities. Order 745-A, at P 28 (citing *Sacramento*, 616 F.3d at 536).   But the Commission's orders themselves prove the irrelevance of *Sacramento*.  The

39

non-jurisdictional entity in that case was not being assessed charges for use of its own facilities; instead, the tariff rate was compensating a jurisdictional utility — the California Independent System Operator Corporation ("California ISO") — for "transmission losses on the [California] *ISO's* grid." *Id*. (quoting *Sacramento*, 616 F.3d at 536) (emphasis added) (JA __). *Sacramento* thus stands only for the unremarkable proposition that the Commission has authority to regulate rates charged by public utilities for interstate transmission service.

Finally, the Commission's reliance on *United Distribution* is equally unavailing. In its orders, the Commission mistakenly suggests that *United Distribution* upheld the Commission's authority "to regulate resales of natural gas transportation capacity by non-jurisdictional entities." *Id*. In fact, the Court merely upheld the Commission's authority to condition a customer's right to use ***jurisdictional*** interstate transportation service, including its right to resell pipeline transportation capacity. 88 F.3d at 1151-54. Both this Court and the Ninth Circuit have rejected arguments that *United Distribution* eliminated the Federal Power Act's express exemption of municipal utilities from rate regulation or granted the Commission authority to regulate their rates or to order them to pay refunds based on their

participation in RTO markets.  *Transmission Agency*, 495 F.3d at 675 n.9;

*Bonneville Power Admin. v. FERC*, 422 F.3d 908, 922-23 (9th Cir. 2005).

In short, there is no support for the Commission's suggestion that

paying retail customers not to purchase energy at retail is analogous to the

capacity, transmission, and natural gas transportation issues addressed in

these earlier cases.  Order 745-A, at P 31 (JA __); *see also id.* at P 30 (JA __).

The Commission has not cited — and cannot cite — any authority for the

notion that it may regulate retail sales by bringing certain retail customers

into the wholesale markets and paying them not to purchase energy at retail.

### C.    The Commission's Orders Unreasonably Interfere With The States' Exclusive Jurisdiction Over Retail Services.

The Commission's orders are also invalid because they unreasonably

interfere with existing state and local programs addressing retail customer

"demand response" and with state policy choices not to implement such

programs at this time.  The States have long regulated issues relating to

retail consumption, and Congress has given no hint, much less any clear

indication, that it intended for the Commission to intrude on this core area

of traditional state regulation.  *See American Bar Ass'n v. FTC*, 430 F.3d 457,

472 (D.C. Cir. 2005) (unreasonable for federal agency to regulate area

41

traditionally subject to state regulation when Congress has not spoken in clear terms).  Moreover, the Commission has not responded in a meaningful fashion to concerns that its orders will adversely impact efforts at the state and local level to develop "demand response" programs.  *See Williams Gas Processing-Gulf Coast Co., L.P. v. FERC*, 475 F.3d 319 (D.C. Cir. 2006) (Commission did not reasonably explain its assertion of jurisdiction).

The Commission contends that it possesses jurisdiction over "demand response" by virtue of its "direct effect on wholesale prices" and because paying retail customers to reduce retail purchases "helps to mitigate generator market power and strengthen system reliability."  Order 745-A, at PP 23-24 (JA __); *see also* Order 745, at PP 112-115 (JA __) (Commission "has jurisdiction over demand response … because it directly affects wholesale rates").  But this explanation is non-responsive to the jurisdictional concerns raised in comments before the agency, and provides no reasoned basis for intruding on this core area of traditional state retail rate regulation.  *See City of Vernon, Cal. v. FERC*, 845 F.2d 1042, 1048 (D.C. Cir. 1988) (agency cannot respond to concerns "with a non sequitur").

Moreover, the Commission has failed to address the effect its orders will have on the development of "demand response" programs at the state

level and by non-jurisdictional utilities. Numerous commenters, including

state regulatory commissions and ISOs and RTOs, described the "demand

response" and dynamic pricing programs developed (at considerable time

and expense) by states, state-regulated utilities, and non-jurisdictional

utilities for purposes of addressing the disconnect between wholesale and

retail prices. *See, e.g.,* R.233 at 3, 7 (MISO States) (JA __); Order 745, at P 9

(JA __) (states are "pursuing retail-level price-responsive demand

initiatives"). These commenters warned that the Commission's new

compensation scheme could interfere with these efforts. For example, the

Illinois Commerce Commission noted that, by over-compensating retail

customers for reducing their demand, the Commission would "reduce the

incentive for implementation of retail rates which reflect wholesale prices,"

and that "as the value of the subsidy increases, the state commission's

likelihood of implementing time-differentiated retail rates decreases." R.10

at 14 (Illinois Commerce Comm'n) (JA __). Representatives from state

regulatory commissions likewise explained that the Commission's rule

would impede efforts to install "smart meters," as "[a]n efficient retail price

signal made possible by smart metering technology would be replaced with

an inefficient price signal in the wholesale market." R.74 at 5 (MISO States)

43

(JA __).    On rehearing, these representatives again objected that "state commissions would be faced with the task of revising retail rate structures in order to correct a price distortion created by a wholesale market pricing mechanism."   R.233 at 6 (MISO States) (JA __).   Similar concerns were echoed by a large number of parties.  *See, e.g.*, R.131 at 20-22 (ODEC) (JA __); R.79 at 2 (Delaware PSC) (JA __); R.50 at 4-6 (Ohio PUC) (JA __); R.86 at 12 (NYISO) (JA __).

Instead of substantively addressing these concerns, the Commission declared that it was not required to consider the impact of its actions on retail "demand response" programs because Order 745 "does not directly affect retail-level demand response programs, nor does it require that demand response resources offer into the wholesale market only."   Order 745-A, at P 71 (JA __).   The Commission thus unreasonably refused to recognize that states and local governments may have reasons for creating their own regulatory regimes for addressing "demand response" at the retail level, or may choose for reasons of state or local policy not to establish incentive pricing regimes for "demand response."

## II.    The Commission's Orders Violate The Federal Power Act And The Requirements Of Reasoned Decision-making.

Even assuming the Commission has jurisdiction, the Commission's orders should be struck down because they violate the Federal Power Act's requirements that rates be just and reasonable and not unduly discriminatory.   *See* 16 U.S.C. §§ 824d, 824e.   The Commission's compensation scheme violates these requirements because it impermissibly over-compensates "demand response" providers, distorts the nation's wholesale markets, and artificially suppresses market prices.   Moreover, the Commission's orders violate the requirements of reasoned decision-making because they depart from precedent without explanation, do not respond meaningfully to objections, and fail to articulate "a satisfactory explanation" for the Commission's action.   *Florida Gas*, 604 F.3d at 639; *see also* 5 U.S.C. § 706(2)(A).

### A.    The Commission's Retail Compensation Scheme Is Unduly Discriminatory And Preferential Because It Overcompensates "Demand Response" Providers.

Section 205(b) of the Federal Power Act prohibits any public utility from making or granting "any undue preference or advantage to any person"; subjecting "any person to any undue prejudice or disadvantage"; or maintaining "any unreasonable difference in rates, charges, service,

45

facilities, or in any other respect, either as between localities or as between classes of service." 16 U.S.C. §§ 824d(b)(1), (2). These prohibitions against granting an undue preference or unduly discriminating are reinforced by section 206(a), which prohibits rates and charges that are "unjust, unreasonable, unduly discriminatory or preferential." 16 U.S.C. § 824e(a). As this Court has recognized, the Commission has a statutory obligation to ensure that rates do not "result in undue prejudice." *Alabama Elec. Coop., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982).

Notwithstanding these statutory requirements, the Commission's retail compensation scheme grants undue preference to "demand response" providers and unduly discriminates against power suppliers by ensuring that "demand response" providers receive more than the value of full LMP as payment for forgoing retail purchases. *See* Order 745-A, at 62,316 (Comm'r Moeller, dissenting) (JA ___). In particular, the Commission's compensation scheme ensures that "demand response" providers receive a windfall because they will be "paid the full LMP *plus* be allowed to retain the savings associated" with their "avoided retail generation cost." *Id*. The result is a scheme that is unduly "preferential to demand resources, and

unduly discriminatory towards other market resources." Order 745, at 31,269 (Comm'r Moeller, dissenting) (JA ___).

In the record below, numerous experts noted that the Commission's approach would provide "demand response" resources with a preferential subsidy and unjustified windfall. *See, e.g.,* R.239 at 8-9 & nn. 17, 20 (EEI) (citing expert testimony). Professor William W. Hogan, one of the principal architects of the LMP pricing model, explained in detail how paying full LMP to retail customers for not consuming electricity results in a "double payment" because the retail customers not only save money by not consuming but they also get paid the full LMP. R.18, Attachment 1, William W. Hogan, *Implications for Consumers of the NOPR's Proposal to Pay the LMP for All Demand Response*, at 5 (JA ___) ("Hogan Paper"). For example, if there were no disconnect between the wholesale and retail prices and both the retail and wholesale price equal $40/megawatt-hour, a "demand response" provider would be doubly compensated under the Commission's scheme for each megawatt-hour it did not purchase at retail: the first $40 being the avoided retail charge and the second $40 being the payment of full LMP. *See id.*; *see also* Order 745, at 31,269 (Comm'r Moeller, dissenting) (JA __) (explaining why "demand response" resources will be overcompensated).

47

The Commission's orders do not dispute that its scheme will result in "demand response" resources being "paid the full LMP plus be[ing] allowed to retain the savings associated with its avoided retail generation cost." Order 745-A, at 62,316 (Comm'r Moeller, dissenting) (JA ___). Nor does the Commission dispute that retail customers and wholesale generators are not similarly situated: unlike demand response resources, wholesale generators do not avoid retail generation costs when they produce energy for sale at wholesale, and unlike wholesale generators, "demand response resources do not create electricity that can be used to serve load." *Id*. at P 56 (JA __). As the Commission concedes, a so-called "negawatt" — a megawatt of electricity not consumed — is not the same as a megawatt. *Id*.; *see also* R.240 at 19-20 (Competitive Power Supplier Ass'ns) (JA __).

The Commission's orders nonetheless maintain that "demand response" providers are entitled to the full LMP payment (in addition to the forgone retail generation charge) because the service they provide is "comparable" to the service provided by generation and that paying "demand response" providers the full LMP is appropriate in light of unspecified "market imperfections caused by the existing barriers to demand response." Order 745-A, at P 58 (JA __). According to the

48

Commission, "demand response" providers and generation "are equally able to assist RTOs and ISOs in maintaining a balance between supply and demand." *Id*. at P 57 (JA __).

The Commission's explanation is non-responsive to the core of petitioners' basic objections and, more importantly, is irrelevant under the statute. *See Dynegy Midwest Generation, Inc. v. FERC*, 633 F.3d 1122 (D.C. Cir. 2011) (criticizing the Commission for being similarly non-responsive). First, it ignores the over-compensation problem that is at the heart of petitioners' claim of undue discrimination. Second, because retail customers and wholesale generators are not similarly situated, providing them with the same full LMP payment is not necessarily appropriate. As this Court has recognized, an undue preference or undue discrimination can result just as surely from treating dissimilarly situated entities the same as it does from treating similarly situated entities differently. *See Alabama Elec.*, 684 F.2d at 27-28.

The basic problem with the Commission's approach is that generators do not benefit from the same retail rate savings as customers who choose to provide "demand response," and generators incur costs when producing electricity that are not incurred by retail customers when electing not to

49

consume energy. Worse yet, the Commission's orders make clear that "demand response" should be compensated only when it will both displace a generating resource and result in significant downward pressure on market prices, thereby passing the net benefits test. *See* Order 745, at PP 48-54 (JA __). Accordingly, the Commission's orders impose an illegal preference in favor of "demand response" providers and unduly discriminate against other suppliers who will not be compensated even when they could have supplied energy more efficiently. *See id.* at 31,271 (Comm'r Moeller, dissenting) (JA ___) ("the corrosive effect of overcompensating demand resources over time will come at the expense of other resources"). A rule so blatantly unduly discriminatory and preferential cannot pass muster under the Federal Power Act.

**B.**  **The Commission's Orders Depart Without Reasoned Explanation From Precedent Recognizing That Full LMP Pricing Unfairly Subsidizes "Demand Response."**

The Commission's requirement that retail customers must be paid the full LMP for providing "demand response" is also invalid because it departs from precedent without reasoned explanation. In earlier orders, the Commission recognized that paying retail customers the full LMP would create an unwarranted "subsidy," *PJM Indus. Customer Coal. v. PJM*

50

*Interconnection, L.L.C.*, 121 FERC ¶ 61,315 at P 26 (2007), and that to avoid over-compensation, retail customers should be paid LMP with an offset to reflect saved retail generation charges (*i.e.*, "LMP-minus-G," where "G" represents the retail generation charge).  *See, e.g., PJM Interconnection, L.L.C.*, 99 FERC ¶ 61,227 at 61,941 (2002) (retail customer should receive "the difference between the LMP and what the customer would save by not using power (the retail price it didn't have to pay)").  Although the Commission's orders now take the opposite position, they fail to acknowledge, much less explain, the Commission's 180-degree change in direction.  This unexplained departure from precedent is quintessentially arbitrary and capricious.  *Wisconsin Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001).

Moreover, although it acknowledged comments from experts and others that the LMP-minus-G approach is necessary to prevent an undue preference — *i.e.*, to ensure that retail customers who provide "demand response" receive the same ***value*** of LMP as wholesale power producers who actually generate energy for sale at wholesale, *see* Order 745-A, at P 60 (JA __), the Commission did not tackle the merits of these objections to its approach.  Instead, it brushed them aside on grounds that "examining cost

51

avoidance by demand response resources is not consistent with the treatment of generation," inasmuch as it "generally does not examine each of the costs of production for individual [generation] resources." *Id.* at P 65 (JA ___).

This is a *non sequitur* and not a reasoned response to the objections raised. Even assuming one can get far enough through the looking glass to accept that a retail customer's decision not to consume electricity is a form of supply, the avoided retail payment (*i.e.*, "G") is not by any measure a cost of production; instead, it is a benefit of not consuming. Moreover, offsetting the payment to a retail customer by the "G" amount has nothing to do with determining the retail customer's cost of production; instead, it is a matter of trying to approximate the price signal that the retail customer would see if the existing disconnect between wholesale and retail rates did not exist. These points were raised before the Commission but were never answered. *See PSEG Energy Res. & Trade LLC v. FERC*, 665 F.3d 203, 210 (D.C. Cir. 2011) (not enough for agency to "characterize objections," it must "answer them").

## C.    The Commission's Retail Compensation Scheme Is Unjust And Unreasonable Because It Distorts The Market.

The Commission's retail compensation scheme will not achieve its stated purpose but will instead inject unjust and unreasonable distortions into the nation's electricity markets.  Although the Commission has sought to justify regulating "demand response" as necessary to address inefficiencies in ISO-/RTO-operated wholesale markets, it failed to consider the significant inefficiencies caused by paying retail customers the full LMP for not purchasing energy at retail.

The Commission's approach is inconsistent with rudimentary principles of economics.  As a large number of respected economists and commenters, including the Federal Trade Commission, observed, paying full LMP to certain retail customers for not purchasing energy at retail "will lead" those customers "to provide too much demand response."  R.58 at 7 (FTC) (JA ___); *see also* R.10 at 5-6 (Illinois Commerce Comm'n) (JA __) (compensation at full LMP will provide customers incentive to provide too much "demand response"); R.76 at 8 (PJM Interconnection) (JA __) (LMP payment "distorts demand response incentives in such a manner as to inefficiently encourage additional demand response at lower market

53

prices"); R.123 at 7 (Potomac Economics) (JA __) (full LMP payment results in the demand response provider "receiving a subsidy to curtail equal to the retail rate").  In particular, as Commissioner Moeller noted, retail customers "will begin to make inefficient decisions about using power" because they "now stand to receive more than the market price as an incentive to curtail their consumption."  Order 745, at 31,271 (Moeller, Comm'r, dissenting) (JA ___).

Contrary to the Commission's stated objectives, instead of approximating the efficient market outcomes that would occur if retail customers saw, and could respond to, changes in wholesale prices, the Commission's compensation scheme will promote inefficient "demand response."  Returning to Professor Hogan's example, if the retail rate and the LMP are both $40/megawatt-hour, the customer should not receive a payment to curtail its consumption because it is already saving $40/megawatt-hour by not using any electricity.  In contrast, if the LMP is $40/megawatt-hour but the retail rate is $30/megawatt-hour, the customer should only have to be paid $10/megawatt-hour (not $40) to curtail its usage because that payment, combined with the saved retail rate, would

result in an overall benefit to the customer that matches the value of the electricity at that time and location.

By over-compensating demand response, the Commission's rule will have negative implications for consumers and the organized wholesale markets over the long term. Among other things, the Commission's rule will "unfairly shift the costs resulting from the inefficient curtailment to those retail customers who do not participate in" "demand response," which are "typically small residential and commercial customers." R.105 at 3 (MISO) (JA __); *see also* Hogan Paper at 6-7 (JA __) (the Commission's rule would create perverse incentives for generation to exit the organized market); R.86 at 15 (NYISO) (JA __) ("new technologies may be kept out of the market"); Order 745, at 31,271 (Moeller, Comm'r, dissenting) (JA ___) (the compensation scheme will result in "inefficiencies" that "impose long-term costs on the energy markets"). The American Public Power Association, along with other commenters, also made the point that the distorting effects of the Commission's rule will extend beyond the electricity markets. For example, decreased industrial production and lost hours of employment associated with reductions in retail use may cause more overall harm than the individual retail customer gains in revenues. *See* R.187 at 3

55

(APPA) (JA ___).   In the end, paying retail customers full LMP is "inconsistent with fundamental economics" and will "over compensate participants in economic load response programs, negatively affect the efficient operation of the energy markets and provide no offsetting social benefit."  R.124 at 2 (PJM Independent Market Monitor) (JA __).

**D.     The Commission's Retail Customer Compensation Scheme Is Unjust And Unreasonable Because It Results In Artificially Suppressed Market Prices.**

In its orders below, the Commission repeatedly trumpeted the ability of "demand response" to lower prices by "reduc[ing] dispatch of higher-priced resources to satisfy load" and to "mitigate generator market power" because "the more demand response that sees and responds to higher market prices … the more downward pressure it places on generator bidding strategies by increasing the risk to a supplier that it will not be dispatched if it bids a price that is too high."  Order 745, at P 10 (JA __).  This position is illustrated in the Commission's directive that "demand response" be compensated only when it can displace a generator and when it lowers the LMP to such an extent that the price reduction will offset the increased cost per unit to remaining customers.  *Id.* at PP 48-54 (JA __).  As Commissioner Moeller observed, this test is unprecedented because it

56

requires a "demand response" resource "to show that its participation will depress the market price." *Id.* at 31,269 (Moeller, Comm'r, dissenting) (JA ___).

Whatever the superficial appeal of lowering prices in the short run, the Commission's approach affects the ability of the market to provide accurate price signals. A just and reasonable rate is one that provides "enough revenue not only for operating expenses but also for the capital costs of the business," and is sufficient for the utility to "maintain its credit and to attract capital." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944); *Farmers Union Cent. Exch. v. FERC*, 734 F.2d 1486, 1502 (D.C. Cir. 1984) (just and reasonable rates must be neither "less than compensatory" to producers nor "excessive" to consumers). Nonetheless, even as the Commission extolled the ability of "demand response" to "mov[e] prices closer to the levels that would result if all demand could respond to the marginal cost of energy," Order 745-A, at P 59 (JA __), it failed to consider how its policies would impact market signals and the ability of generators to recover their costs.

The Commission also failed to analyze how its new rule and the attendant increase in participation by "demand response" resources would interact with existing ISO and RTO rules to control the exercise of market

power.   The tariffs of each ISO and RTO contain extensive provisions relating to the mitigation of supplier market power that have been accepted by the Commission as just and reasonable, and which the Commission has repeatedly emphasized are "sufficient to address any market power concerns." *Market-Based Rates for Wholesale Sales of Electric Energy, Capacity & Ancillary Servs. by Pub. Utils.*, Order No. 697-A, FERC Stats. & Regs. ¶ 31,268 at P 111 (2008); *see also Maryland Pub. Serv. Comm'n v. PJM Interconnection, L.L.C.*, 123 FERC ¶ 61,169, *order on reh'g*, 125 FERC ¶ 61,340 (2008); *Connecticut ex rel. Blumenthal v. ISO New England Inc.*, 117 FERC ¶ 61,038 (2006); *California Elec. Oversight. Bd. v. California Indep. Sys. Operator Corp.*, 109 FERC ¶ 61,182 (2004).   Consistent with the principle that the setting of "just and reasonable" rates "involves a balancing of the investor and the consumer interests," *Hope*, 320 U.S. at 603, these market-power rules were designed to "strik[e] a balance between … detecting and dampening exercises of market power and … allowing generators to charge prices that are high enough for them to recover their fixed costs." *Wisconsin Pub. Power*, 493 F.3d at 262.   While petitioners may disagree with the Commission (and one another) as to whether these measures appropriately balance the risks of

over-mitigation against those of under-mitigation, there is no question that they strike a balance that the Commission has found acceptable.

Moreover, although the Commission's orders assert that full LMP compensation would help "mitigate generator market power," Order 745, at P 10 (JA __), the Commission refused to address in any meaningful fashion the objections raised about the interaction of its new compensation scheme with existing market power mitigation measures. *See* Order 745-A, at PP 76-78 (JA ___). In particular, the Commission did not even attempt to gauge the impact of this additional market power mitigation on the careful balance between under-mitigation and over-mitigation built into the existing market power mitigation rules. Nor did it respond to concerns that additional market power mitigation could tip that balance in favor of over-mitigation. And it did not consider whether its new compensation scheme would cause rates to be unjust and unreasonable for generation sources. Instead, when EPSA and others made these points on rehearing, the Commission offered a classic non-response, asserting that it was merely articulating the "general principle that greater competition in the market helps to limit potential opportunities for the exercise of market power." *Id*. at P 77 (JA __).

The Commission's failure to examine the impact of increased "demand response" participation on the balance between under-mitigation and over-mitigation is incompatible with controlling precedent. *Hope* and other cases recognize the need for a balancing of investor and consumer interests. *See Grand Council of the Crees v. FERC*, 198 F.3d 950, 956 (D.C. Cir. 2000) ("the investor interest has a legitimate concern with the financial integrity of the company whose rates are being regulated") (quoting *Hope*, 320 U.S. at 603). Moreover, because the Commission focused only on providing customers with "a short-term benefit by way of a lower LMP," it ignored that under-compensating producers would "impose long-term costs on the energy markets." Order 745, at 31,272 (Moeller, Comm'r, dissenting) (JA __); *see also* R.100 at 29 (ISO-NE) (JA __) ("any consumer gains from suppression of LMPs in the short-run will result in higher prices and costs in the long-run"); R.86 at 3 (NYISO) (JA __) (the rule will "create perverse incentives and slow the introduction of other innovative clean technologies by uneconomically suppressing real-time prices"); R.105 at 3 (MISO) (JA __) ("overcompensating [demand response] will result in an artificial market construct"). By simplistically "equating the concept of a just and reasonable rate with a lower price," Order 745, at 31,270 (Moeller, Comm'r, dissenting)

60

(JA __), the Commission abdicated its responsibility to ensure that rates remain just and reasonable for suppliers and to safeguard the long-term health of the energy markets.

## III.    The Commission's Orders Violate Section 206 By Ordering Rate Changes Without First Demonstrating That Existing Rates Were Unjust And Unreasonable.

Even assuming, for sake of argument, that the Commission has jurisdiction to regulate retail customers' decisions about how much energy to consume at retail, the Commission has disregarded section 206's fundamental requirement that the agency may not order changes to rates that are already "in effect" without first finding that those rates are no longer just and reasonable.  *Atlantic City*, 295 F.3d at 8.

Before it issued Order 745, the Commission accepted a number of ISO and RTO tariff filings under section 205 to implement their respective "demand response" programs.  *See Regional Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,061 (1999); Order 719, FERC Stats. & Regs. ¶ 31,281 at P 50.  In ordering changes to these tariffs and imposing a one-size-fits-all obligation to compensate retail customers, the Commission claimed to have satisfied the requirements of section 206 because it found that paying "demand response" anything "other than the LMP is unjust and

unreasonable."   Order 745, at P 47 (JA __); *see also* Order 745-A, at P 73 (JA ___).  But it provided no support for that conclusory assertion.  Nor did it explain why each of the existing ISO and RTO tariffs had become unjust and unreasonable.

Seeking to overcome this deficiency, the Commission's orders state that it had already found other approaches unreasonable in Order 719, when it made "clear that demand response resources … would receive the market clearing price."  Order 745-A, at P 74 (JA __).  But that is no explanation.  As the Commission concedes, "the levels of compensation for demand response vary significantly among RTOs and ISOs," Order 745, at P 14 (JA __), and it had "previously accepted a variety of RTO and ISO proposals for compensation for demand response resources."   Order 745-A, at P 74 (JA __).

The Commission's orders also include no explanation why the "variety of … proposals" it had "previously accepted" are no longer just and reasonable.   Although the Commission devotes five paragraphs of its rehearing order to discussing the argument, the Commission's substantive explanation is terse:

> [B]ased on the record of the proceeding, and balancing the diverging opinions of noted experts, the Commission determined that it was necessary in this instance to adopt a uniform compensation rule for demand response resources participating in the organized wholesale energy markets under the conditions set forth in the Final Rule.  We are not convinced … that this decision was in error.

*Id*.; *see also id*. PP 72-75 (JA __).  This conclusory explanation falls far short of what section 206 demands before the Commission can sweep aside previously accepted tariff provisions.  *See Atlantic City*, 295 F.3d at 8.

Indeed, nowhere in the Commission's orders is there any fact-specific determination concerning the just and reasonableness of each ISO's or RTO's approach as applied in each of their respective markets.  For example, before Order 745, the amount of "demand response" capacity participating in PJM's markets increased seven-fold from 2006 to 2010, while the amount of "demand response" resources increased by 17 percent in New England in 2009 alone.  *See* R.240 at 36 & n.124 (Competitive Power Supplier Ass'ns) (JA __).  Similarly, PJM's capacity payments to "demand response" resources increased by more than 100 percent from 2008 to 2009, while "demand response" compensation in New England increased by more than 25 percent in 2009 alone.  *Id.*  Without addressing this record evidence, the

63

Commission ordered modifications to existing ISO and RTO tariffs "without ever determining that the existing region-by-region approach to compensation is unjust and unreasonable." Order 745, at 31,268 (Comm'r Moeller, dissenting) (JA __).

To make matters worse, the Commission also failed to explain how much "demand response" is supposed to be enough. Order 745-A, at P 60 (JA __). The Commission offers no reasoned analysis supporting its vague suggestions that it is always desirable for retail customers to purchase less energy, or that a uniform approach is appropriate to achieving that objective. *See, e.g., National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (asserting "that an order ameliorates a real industry problem but then citing no evidence demonstrating that there is in fact an industry problem is not reasoned decisionmaking"); *cf. Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 525 (D.C. Cir. 1983) (agency cannot justify regulation on theory that lead threatens human health and regulation will reduce lead levels in gasoline).

The Commission likewise failed to explain why paying retail customers full LMP compensation for not purchasing electric energy at retail would help achieve an appropriate level of "demand response." The

Commission merely asserted that there are "barriers that clearly exist to full participation of demand in the wholesale market."  Order 745-A, at P 60 (JA __).  The only "barriers" the Commission identified, however, were "the lack of a direct connection between wholesale and retail prices, lack of dynamic retail prices …, lack of real-time information sharing, and the relative lack of sufficient retail metering technology."  *Id.* at P 59 (JA __).  This recitation serves only to confirm that the "problem" the Commission seeks to remedy lies on the state side of the jurisdictional line drawn by Congress; it does nothing to establish that the Commission's "remedy" is appropriate.

## CONCLUSION

The Court should grant the petitions and vacate the orders below.

Respectfully submitted,

Harvey L. Reiter
  *Counsel of Record*
Adrienne E. Clair
STINSON MORRISON HECKER LLP
1775 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 728-3016
Facsimile: (202) 785-9163
Email: hreiter@stinson.com
Email: aclair@stinson.com

*Counsel for Petitioners American*
*Public Power Association, National*
*Rural Electric  Cooperative Association*
*and Old Dominion Electric Cooperative*

David B. Raskin
  *Counsel of Record*
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone: (202) 429-6254
Facsimile: (202) 429-3902
Email: draskin@steptoe.com

*Counsel for Petitioner*
*Edison Electric Institute*

Dated: June 6, 2012

 /s/ Ashley C. Parrish    
Ashley C. Parrish
  *Counsel of Record*
David G. Tewksbury
Stephanie L. Lim
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
Telephone: (202) 626-2627
Facsimile: (202) 626-3737
Email: aparrish@kslaw.com
Email: dtewksbury@kslaw.com
Email: slim@kslaw.com

*Counsel for Petitioner*
*Electric Power Supply Association*

66

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure and Circuit Rule 32(a)(2), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of content and authorities, certificates of service and compliance, but including footnotes) contains 12,617 words as determined by the word-counting feature of Microsoft Word 2000.

/s/ Ashley C. Parrish
Ashley C. Parrish

# ADDENDUM

# TABLE OF CONTENTS

Section 201 of the Federal Power Act,
   16 USC 824 ................................................................ App-1

Section 205 of the Federal Power Act,
   16 U.S.C. § 824d ......................................................... App-5

Section 206 of the Federal Power Act,
   16 U.S.C. § 824e.......................................................... App-8

Section 209 of the Federal Power Act,
   16 U.S.C. § 824h(b) .................................................... App-13

Section 216 of the Federal Power Act,
   16 U.S.C. § 824p(b)(1)(C) .......................................... App-14

Section 313 of the Federal Power Act,
   16 U.S.C. § 825*l* ...................................................... App-15

Energy Policy Act of 2005, Pub. L. No. 109-58
   Section 1252................................................................ App-18

18 C.F.R. § 35.28(b)(4) ................................................. App-25

## Section 201 of the Federal Power Act, 16 U.S.C. § 824

### Declaration of policy; application of subchapter

(a) Federal regulation of transmission and sale of electric energy

It is declared that the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest, and that Federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest, such Federal regulation, however, to extend only to those matters which are not subject to regulation by the States.

(b) Use or sale of electric energy in interstate commerce

(1) The provisions of this subchapter shall apply to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but except as provided in paragraph (2) shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in this subchapter and subchapter III of this chapter, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter.

(2) Notwithstanding subsection (f) of this section, the provisions of sections 824b(a)(2), 824e(e), 824i, 824j, 824j–1,

824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, and 824v of this title shall apply to the entities described in such provisions, and such entities shall be subject to the jurisdiction of the Commission for purposes of carrying out such provisions and for purposes of applying the enforcement authorities of this chapter with respect to such provisions. Compliance with any order or rule of the Commission under the provisions of section 824b(a)(2), 824e(e), 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title, shall not make an electric utility or other entity subject to the jurisdiction of the Commission for any purposes other than the purposes specified in the preceding sentence.

(c) Electric energy in interstate commerce

For the purpose of this subchapter, electric energy shall be held to be transmitted in interstate commerce if transmitted from a State and consumed at any point outside thereof; but only insofar as such transmission takes place within the United States.

(d) "Sale of electric energy at wholesale" defined

The term "sale of electric energy at wholesale" when used in this subchapter, means a sale of electric energy to any person for resale.

(e) "Public utility" defined

The term "public utility" when used in this subchapter and subchapter III of this chapter means any person who owns or operates facilities subject to the jurisdiction of the Commission under this subchapter (other than facilities subject to such jurisdiction solely by reason of section 824e(e), 824e(f),1 824i, 824j, 824j–1, 824k, 824o, 824p, 824q, 824r, 824s, 824t, 824u, or 824v of this title).

(f) United States, State, political subdivision of a State, or agency or instrumentality thereof exempt

No provision in this subchapter shall apply to, or be deemed to include, the United States, a State or any political subdivision of a State, an electric cooperative that receives financing under the Rural Electrification Act of 1936 (7 U.S.C. 901 et seq.) or that sells less than 4,000,000 megawatt hours of electricity per year, or any agency, authority, or instrumentality of any one or more of the foregoing, or any corporation which is wholly owned, directly or indirectly, by any one or more of the foregoing, or any officer, agent, or employee of any of the foregoing acting as such in the course of his official duty, unless such provision makes specific reference thereto.

(g) Books and records

(1) Upon written order of a State commission, a State commission may examine the books, accounts, memoranda, contracts, and records of—

> (A) an electric utility company subject to its regulatory authority under State law,

> (B) any exempt wholesale generator selling energy at wholesale to such electric utility, and

> (C) any electric utility company, or holding company thereof, which is an associate company or affiliate of an exempt wholesale generator which sells electric energy to an electric utility company referred to in subparagraph (A), wherever located, if such examination is required for the effective discharge of the State commission's regulatory responsibilities affecting the provision of electric service.

(2) Where a State commission issues an order pursuant to paragraph (1), the State commission shall not publicly disclose trade secrets or sensitive commercial information.

(3) Any United States district court located in the State in which the State commission referred to in paragraph (1) is located shall have jurisdiction to enforce compliance with this subsection.

(4) Nothing in this section shall—

  (A) preempt applicable State law concerning the provision of records and other information; or

  (B) in any way limit rights to obtain records and other information under Federal law, contracts, or otherwise.

(5) As used in this subsection the terms "affiliate", "associate company", "electric utility company", "holding company", "subsidiary company", and "exempt wholesale generator" shall have the same meaning as when used in the Public Utility Holding Company Act of 2005 [42 U.S.C. 16451 et seq.].

**Section 205 of the Federal Power Act, 16 U.S.C. § 824d**

**Rates and charges; schedules; suspension of new rates; automatic adjustment clauses**

(a) Just and reasonable rates

All rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges shall be just and reasonable, and any such rate or charge that is not just and reasonable is hereby declared to be unlawful.

(b) Preference or advantage unlawful

No public utility shall, with respect to any transmission or sale subject to the jurisdiction of the Commission, (1) make or grant any undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.

(c) Schedules

Under such rules and regulations as the Commission may prescribe, every public utility shall file with the Commission, within such time and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

(d) Notice required for rate changes

Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after sixty days' notice to the Commission and to the public.  Such notice shall be given by filing with the Commission and keeping open for public inspection new schedules stating plainly the change or changes to be made in the schedule or schedules then in force and the time when the change or changes will go into effect.  The Commission, for good cause shown, may allow changes to take effect without requiring the sixty days' notice herein provided for by an order specifying the changes so to be made and the time when they shall take effect and the manner in which they shall be filed and published.

(e) Suspension of new rates; hearings; five-month period

Whenever any such new schedule is filed the Commission shall have authority, either upon complaint or upon its own initiative without complaint, at once, and, if it so orders, without answer or formal pleading by the public utility, but upon reasonable notice, to enter upon a hearing concerning the lawfulness of such rate, charge, classification, or service; and, pending such hearing and the decision thereon, the Commission, upon filing with such schedules and delivering to the public utility affected thereby a statement in writing of its reasons for such suspension, may suspend the operation of such schedule and defer the use of such rate, charge, classification, or service, but not for a longer period than five months beyond the time when it would otherwise go into effect; and after full hearings, either completed before or after the rate, charge, classification, or service goes into effect, the Commission may make such orders with reference thereto as would be proper in a proceeding initiated after it had become effective.  If the proceeding has not been concluded and an

App-6

order made at the expiration of such five months, the proposed change of rate, charge, classification, or service shall go into effect at the end of such period, but in case of a proposed increased rate or charge, the Commission may by order require the interested public utility or public utilities to keep accurate account in detail of all amounts received by reason of such increase, specifying by whom and in whose behalf such amounts are paid, and upon completion of the hearing and decision may by further order require such public utility or public utilities to refund, with interest, to the persons in whose behalf such amounts were paid, such portion of such increased rates or charges as by its decision shall be found not justified. At any hearing involving a rate or charge sought to be increased, the burden of proof to show that the increased rate or charge is just and reasonable shall be upon the public utility, and the Commission shall give to the hearing and decision of such questions preference over other questions pending before it and decide the same as speedily as possible.

**Section 206 of the Federal Power Act, 16 U.S.C. § 824e**

**Power of Commission to fix rates and charges; determination of cost of production or transmission**

(a) Unjust or preferential rates, etc.; statement of reasons for changes; hearing; specification of issues

Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order. Any complaint or motion of the Commission to initiate a proceeding under this section shall state the change or changes to be made in the rate, charge, classification, rule, regulation, practice, or contract then in force, and the reasons for any proposed change or changes therein. If, after review of any motion or complaint and answer, the Commission shall decide to hold a hearing, it shall fix by order the time and place of such hearing and shall specify the issues to be adjudicated.

(b) Refund effective date; preferential proceedings; statement of reasons for delay; burden of proof; scope of refund order; refund orders in cases of dilatory behavior; interest

Whenever the Commission institutes a proceeding under this section, the Commission shall establish a refund effective date. In the case of a proceeding instituted on complaint, the refund effective date shall not be earlier than the date of the filing of such complaint nor later than 5 months after the filing of such complaint. In the case of a proceeding instituted by the Commission on its own motion, the refund effective date shall

not be earlier than the date of the publication by the Commission of notice of its intention to initiate such proceeding nor later than 5 months after the publication date. Upon institution of a proceeding under this section, the Commission shall give to the decision of such proceeding the same preference as provided under section 824d of this title and otherwise act as speedily as possible. If no final decision is rendered by the conclusion of the 180-day period commencing upon initiation of a proceeding pursuant to this section, the Commission shall state the reasons why it has failed to do so and shall state its best estimate as to when it reasonably expects to make such decision. In any proceeding under this section, the burden of proof to show that any rate, charge, classification, rule, regulation, practice, or contract is unjust, unreasonable, unduly discriminatory, or preferential shall be upon the Commission or the complainant. At the conclusion of any proceeding under this section, the Commission may order refunds of any amounts paid, for the period subsequent to the refund effective date through a date fifteen months after such refund effective date, in excess of those which would have been paid under the just and reasonable rate, charge, classification, rule, regulation, practice, or contract which the Commission orders to be thereafter observed and in force: Provided, That if the proceeding is not concluded within fifteen months after the refund effective date and if the Commission determines at the conclusion of the proceeding that the proceeding was not resolved within the fifteen-month period primarily because of dilatory behavior by the public utility, the Commission may order refunds of any or all amounts paid for the period subsequent to the refund effective date and prior to the conclusion of the proceeding. The refunds shall be made, with interest, to those persons who have paid those rates or charges which are the subject of the proceeding.

(c) Refund considerations; shifting costs; reduction in revenues; "electric utility companies" and "registered holding company" defined

Notwithstanding subsection (b) of this section, in a proceeding commenced under this section involving two or more electric utility companies of a registered holding company, refunds which might otherwise be payable under subsection (b) of this section shall not be ordered to the extent that such refunds would result from any portion of a Commission order that (1) requires a decrease in system production or transmission costs to be paid by one or more of such electric companies; and (2) is based upon a determination that the amount of such decrease should be paid through an increase in the costs to be paid by other electric utility companies of such registered holding company: Provided, That refunds, in whole or in part, may be ordered by the Commission if it determines that the registered holding company would not experience any reduction in revenues which results from an inability of an electric utility company of the holding company to recover such increase in costs for the period between the refund effective date and the effective date of the Commission's order. For purposes of this subsection, the terms "electric utility companies" and "registered holding company" shall have the same meanings as provided in the Public Utility Holding Company Act of 1935, as amended.1

(d) Investigation of costs

The Commission upon its own motion, or upon the request of any State commission whenever it can do so without prejudice to the efficient and proper conduct of its affairs, may investigate and determine the cost of the production or transmission of electric energy by means of facilities under the jurisdiction of the Commission in cases where the Commission has no authority to establish a rate governing the sale of such energy.

(e) Short-term sales

(1) In this subsection:

> (A) The term "short-term sale" means an agreement for the sale of electric energy at wholesale in interstate commerce that is for a period of 31 days or less (excluding monthly contracts subject to automatic renewal).

> (B) The term "applicable Commission rule" means a Commission rule applicable to sales at wholesale by public utilities that the Commission determines after notice and comment should also be applicable to entities subject to this subsection.

(2) If an entity described in section 824(f) of this title voluntarily makes a short-term sale of electric energy through an organized market in which the rates for the sale are established by Commission-approved tariff (rather than by contract) and the sale violates the terms of the tariff or applicable Commission rules in effect at the time of the sale, the entity shall be subject to the refund authority of the Commission under this section with respect to the violation.

(3) This section shall not apply to—

> (A) any entity that sells in total (including affiliates of the entity) less than 8,000,000 megawatt hours of electricity per year; or

> (B) an electric cooperative.

(4)(A) The Commission shall have refund authority under paragraph (2) with respect to a voluntary short term sale of electric energy by the Bonneville Power Administration only if the sale is at an unjust and unreasonable rate.

> (B) The Commission may order a refund under subparagraph (A) only for short-term sales made by the

Bonneville Power Administration at rates that are higher than the highest just and reasonable rate charged by any other entity for a short-term sale of electric energy in the same geographic market for the same, or most nearly comparable, period as the sale by the Bonneville Power Administration.

(C) In the case of any Federal power marketing agency or the Tennessee Valley Authority, the Commission shall not assert or exercise any regulatory authority or power under paragraph (2) other than the ordering of refunds to achieve a just and reasonable rate.

**Section 209 of the Federal Power Act, 16 U.S.C. § 824h(b)**

**References to State boards by Commission**

\* \* \*

(b) Cooperation with State commissions

The Commission may confer with any State commission regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

\* \* \*

**Section 216 of the Federal Power Act, 16 U.S.C. § 824p(b)(1)(C)**

**Siting of interstate electric transmission facilities**

\* \* \*

(C) a State commission or other entity that has authority to approve the siting of the facilities has—

(i) withheld approval for more than 1 year after the filing of an application seeking approval pursuant to applicable law or 1 year after the designation of the relevant national interest electric transmission corridor, whichever is later; or

(ii) conditioned its approval in such a manner that the proposed construction or modification will not significantly reduce transmission congestion in interstate commerce or is not economically feasible.

\* \* \*

## Section 313 of the Federal Power Act, 16 U.S.C. § 825*l*

### Review of orders

(a) Application for rehearing; time periods; modification of order

Any person, electric utility, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, electric utility, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any entity unless such entity shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

(b) Judicial review

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the United States court of appeals for any circuit wherein the licensee or public utility to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the

order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings which, if supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(c) Stay of Commission's order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

**Energy Policy Act of 2005, Pub. L. No. 109-58, § 1252**

SEC. 1252. Smart Metering

(a) IN GENERAL.—Section 111(d) of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2621(d)) is amended by adding at the end the following:

"(14)    TIME–BASED    METERING    AND COMMUNICATIONS.—(A) Not later than 18 months after the date of enactment of this paragraph, each electric utility shall offer each of its customer classes, and provide individual customers upon customer request, a time-based rate schedule under which the rate charged by the electric utility varies during different time periods and reflects the variance, if any, in the utility's costs of generating and purchasing electricity at the wholesale level. The time-based rate schedule shall enable the electric consumer to manage energy use and cost through advanced metering and communications technology.

"(B) The types of time-based rate schedules that may be offered under the schedule referred to in subparagraph (A) include, among others—

"(i) time-of-use pricing whereby electricity prices are set for a specific time period on an advance or forward basis, typically not changing more often than twice a year, based on the utility's cost of generating and/or purchasing such electricity at the wholesale level for the benefit of the consumer. Prices paid for energy consumed during these periods shall be pre-established and known to consumers in advance of such consumption, allowing them to vary their demand and usage in response to such prices and manage their energy costs by shifting usage to a lower

cost period or reducing their consumption overall;

"(ii) critical peak pricing whereby time-of-use prices are in effect except for certain peak days, when prices may reflect the costs of generating and/or purchasing electricity at the wholesale level and when consumers may receive additional discounts for reducing peak period energy consumption;

"(iii) real-time pricing whereby electricity prices are set for a specific time period on an advanced or forward basis, reflecting the utility's cost of generating and/or purchasing electricity at the wholesale level, and may change as often as hourly; and

"(iv) credits for consumers with large loads who enter into pre-established peak load reduction agreements that reduce a utility's planned capacity obligations.

"(C) Each electric utility subject to subparagraph (A) shall provide each customer requesting a time-based rate with a time-based meter capable of enabling the utility and customer to offer and receive such rate, respectively.

"(D) For purposes of implementing this paragraph, any reference contained in this section to the date of enactment of the Public Utility Regulatory Policies Act of 1978 shall be deemed to be a reference to the date of enactment of this paragraph.

"(E) In a State that permits third-party marketers to sell electric energy to retail electric consumers, such consumers shall be entitled to receive the same time-

App-19

based metering and communications device and service as a retail electric consumer of the electric utility.

"(F) Notwithstanding subsections (b) and (c) of section 112, each State regulatory authority shall, not later than 18 months after the date of enactment of this paragraph conduct an investigation in accordance with section 115(i) and issue a decision whether it is appropriate to implement the standards set out in subparagraphs (A) and (C).".

(b) STATE INVESTIGATION OF DEMAND RESPONSE AND TIME–BASED METERING.—Section 115 of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2625) is amended as follows:

(1) By inserting in subsection (b) after the phrase "the standard for time-of-day rates established by section 111(d)(3)" the following: "and the standard for time-based metering and communications established by section 111(d)(14)".

(2) By inserting in subsection (b) after the phrase "are likely to exceed the metering" the following: "and communications".

(3) By adding at the end the following:

"(i) TIME–BASED METERING AND COMMUNICATIONS.— In making a determination with respect to the standard established by section 111(d)(14), the investigation requirement of section 111(d)(14)(F) shall be as follows: Each State regulatory authority shall conduct an investigation and issue a decision whether or not it is appropriate for electric utilities to provide and install time-based meters and communications devices for each of their customers which enable such customers to participate in time-based pricing rate schedules and other demand response programs.".

App-20

\* \* \*

(e)    DEMAND    RESPONSE    AND    REGIONAL COORDINATION.—

   (1) IN GENERAL.—It is the policy of the United States to encourage States to coordinate, on a regional basis, State energy policies to provide reliable and affordable demand response services to the public.

   (2)   TECHNICAL   ASSISTANCE.—The   Secretary   shall provide   technical   assistance   to   States   and   regional organizations formed by two or more States to assist them in—

      (A) identifying the areas with the greatest demand response potential;

      (B)   identifying   and   resolving   problems   in transmission   and   distribution   networks,   including through the use of demand response;

      (C) developing plans and programs to use demand response to respond to peak demand or emergency needs; and

      (D) identifying specific measures consumers can take   to   participate   in   these   demand   response programs.

   (3) REPORT.—Not later than 1 year after the date of enactment   of   the   Energy   Policy   Act   of   2005,   the Commission shall prepare and publish an annual report, by appropriate region, that assesses demand response resources, including those available from all consumer classes, and which identifies and reviews—

(A) saturation and penetration rate of advanced meters and communications technologies, devices and systems;

(B) existing demand response programs and time-based rate programs;

(C) the annual resource contribution of demand resources;

(D) the potential for demand response as a quantifiable, reliable resource for regional planning purposes;

(E) steps taken to ensure that, in regional transmission planning and operations, demand resources are provided equitable treatment as a quantifiable, reliable resource relative to the resource obligations of any load-serving entity, transmission provider, or transmitting party; and

(F) regulatory barriers to improve customer participation in demand response, peak reduction and critical period pricing programs.

* * *

(g) TIME LIMITATIONS.—Section 112(b) of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2622(b)) is amended by adding at the end the following:

"(4)(A) Not later than 1 year after the enactment of this paragraph, each State regulatory authority (with respect to each electric utility for which it has ratemaking authority) and each nonregulated electric utility shall commence the consideration referred to in section 111, or set a hearing date for such consideration, with respect to the standard established by paragraph (14) of section 111(d).

"(B) Not later than 2 years after the date of the enactment of this paragraph, each State regulatory authority (with respect to each electric utility for which it has ratemaking authority), and each nonregulated electric utility, shall complete the consideration, and shall make the determination, referred to in section 111 with respect to the standard established by paragraph (14) of section 111(d).".

(h) FAILURE TO COMPLY.—Section 112(c) of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2622(c)) is amended by adding at the end the following:

"In the case of the standard established by paragraph (14) of section 111(d), the reference contained in this subsection to the date of enactment of this Act shall be deemed to be a reference to the date of enactment of such paragraph (14).".

(i) PRIOR STATE ACTIONS REGARDING SMART METERING STANDARDS.—

(1) IN GENERAL.—Section 112 of the Public Utility Regulatory Policies Act of 1978 (16 U.S.C. 2622) is amended by adding at the end the following:

"(e) PRIOR STATE ACTIONS.—Subsections (b) and (c) of this section shall not apply to the standard established by paragraph (14) of section 111(d) in the case of any electric utility in a State if, before the enactment of this subsection—

"(1) the State has implemented for such utility the standard concerned (or a comparable standard);

"(2) the State regulatory authority for such State or relevant nonregulated electric utility has conducted a proceeding to consider implementation of the

standard concerned (or a comparable standard) for such utility within the previous 3 years; or

"(3) the State legislature has voted on the implementation of such standard (or a comparable standard) for such utility within the previous 3 years.".

(2) CROSS REFERENCE.—Section 124 of such Act (16 U.S.C. 2634) is amended by adding the following at the end thereof: "In the case of the standard established by paragraph (14) of section 111(d), the reference contained in this subsection to the date of enactment of this Act shall be deemed to be a reference to the date of enactment of such paragraph (14).".

**TITLE 18 — CONSERVATION OF POWER AND WATER RESOURCES**

**CHAPTER I — FEDERAL ENERGY REGULATORY COMMISSION, DEPARTMENT OF ENERGY**

**SUBCHAPTER B — REGULATIONS UNDER THE FEDERAL POWER ACT**

**PART 35 — FILING OF RATE SCHEDULES AND TARIFFS**

**Subpart C — Other Filing Requirements**

**Section 35.28(b)(4) Non-discriminatory open access transmission tariff.**

. * * *

>    (4) *Demand response* means a reduction in the consumption of electric energy by customers from their expected consumption in response to an increase in the price of electric energy or to incentive payments designed to induce lower consumption of electric energy.

* * *

## CERTIFICATE OF SERVICE

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I hereby certify that I have this 6th day of June 2012, served a copy of the foregoing documents electronically through the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

_____/s/ Ashley C. Parrish_____
Ashley C. Parrish
